NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO.  A-3704-11T4

IN THE MATTER OF APPLICATION OF
JONATHAN R. WHEELER FOR A RETIRED
OFFICER PERMIT TO CARRY A FIREARM
OPENLY AND/OR CONCEALED.

IN THE MATTER OF APPLICATION OF
GEORGE A. DAUDELIN FOR A RETIRED
OFFICER PERMIT TO CARRY A FIREARM
OPENLY AND/OR CONCEALED.

_____

```
APPROVED FOR PUBLICATION

December 30, 2013

APPELLATE DIVISION
```

Argued March 6, 2013 - Decided December 30, 2013

Before Judges Grall, Koblitz and Accurso.

On appeal from Superior Court of New
Jersey, Law Division, Essex County.

J. Sheldon Cohen argued the cause for
appellants Wheeler and Daudelin (DeCotiis,
FitzPatrick & Cole, LLP, attorneys; Steven
C. Mannion, on the brief).

Maria I. Guerrero, Special Deputy Attorney
General/Acting Assistant Prosecutor, argued
the cause for respondent State of New Jersey
(Carolyn A. Murray, Acting Essex County
Prosecutor, attorney; Ms. Guerrero, of
counsel and on the brief).

The opinion of the court was delivered by

GRALL, J.A.D.

TABLE OF CONTENTS

  I. Introduction                                                    3

 II. Facts                                                           5

III. The Firearms Law                                               7

     A.  The Purpose, Requirements, Narrow Scope
         and Role of the Carry Permit Law                           8
         1.  The Purpose and Requirements                           8
         2.  The Narrow Scope                                      10
         3.  The Similar Roles of Employment-Based
             Exemptions from the Carry Permit Law
             and the "Justifiable Need" Standard                  15
         4.  The Role of Special Permits for Retired
             Police Officers                                      18
         5.  The Legislature's "Justifiable Need"
             Requirement is Consistent with the
             Lawful Defensive Use of Firearms                     23
     B.  The History of the Carry Permit Law                      24
     C.  The Factual Justifications for the Carry
         Permit Law                                               26
     D.  Summary                                                  31

 IV. The Second Amendment                                         32

     A.  The Claim Presented                                      32
     B.  The Right                                                34
         1.  The Narrow Holdings in Heller and
             McDonald                                             35
         2.  The Broad Reasoning Supporting the
             Narrow Holdings in Heller and McDonald              37
         3.  The Threshold Question Raised by the
             Court's Narrow Holdings and Broader
             Reasoning                                            38
         4.  Limitations on the Right                             42
         5.  The Standard of Scrutiny                             52
         6.  "Justifiable Need" Passes Muster                     62

  V. Equal Protection                                             76

 VI. Privileges and Immunities                                   83

VII. Preemption                                                   85

A-3704-11T4

## I. Introduction

Jonathan R. Wheeler and George A. Daudelin retired from the Arson Investigation Unit (AIU) of Newark's Fire Department and later applied to the Division of State Police (Division) for a special permit authorizing certain retired law enforcement officers to carry handguns. N.J.S.A. 2C:39-6*l*(1)-(4).[1] These special carry permits may be issued to retirees who either served in an enumerated law enforcement agency or served with an agency in another state and are "qualified retired law enforcement officer[s], as [that term is] used in the federal 'Law Enforcement Officers Safety Act of 2004' [(LEOSA)], Pub. L. No. 108-277, domiciled in this State." N.J.S.A. 2C:39-6*l*; In re Casaleggio, 420 N.J. Super. 121, 128-29 (App. Div. 2011) (so interpreting subsection *l*'s reference to LEOSA, 18 U.S.C.S. § 926C).

Another type of carry permit is available to any qualified person who can demonstrate a "justifiable need" for carrying a handgun. N.J.S.A. 2C:58-4d. To acquire one, an applicant must show "'an urgent necessity . . . for self-protection'" based on "specific threats or previous attacks demonstrating a special danger to the applicant's life that cannot be avoided by other

---

[1] Subsection *l* is italicized to distinguish the lowercase letter "l" from the numeral "1."

means."  In re Preis, 118 N.J. 564, 571 (1990) (quoting Siccardi v. State, 59 N.J. 545, 557 (1971)).  Neither Wheeler nor Daudelin applied for that type of carry permit, because they concluded they could not show "justifiable need."

The Division denied Wheeler's and Daudelin's application. Challenging the constitutionality of the carry permit laws, both requested a hearing in the Law Division.  N.J.S.A. 2C:39-6*l*(5). After consolidating the cases and taking testimony, the judge affirmed the denials.

On appeal, the applicants acknowledge their ineligibility for either type of carry permit and renew and expand their constitutional challenges.  The questions presented are: 1) whether the "justifiable need" requirement of N.J.S.A. 2C:58-4d violates the Second Amendment; 2) whether subsection *l* of N.J.S.A. 2C:39-6 arbitrarily distinguishes between eligible retired officers and others; 3) whether distinctions between retired officers domiciled in New Jersey and elsewhere violate the Privileges and Immunities Clause of Article IV, Section 2 — an issue not raised in the trial court; and 4) whether LEOSA would preempt these applicants' prosecution for possessing a handgun without a permit in violation of N.J.S.A. 2C:39-5b — an issue not properly raised in the Law Division.

Because the facts are not in dispute and the questions turn on interpretation of statutes and the Constitution, we owe no deference to the judge's determinations. Borough of Harvey Cedars v. Karan, 214 N.J. 384, 401-02 (2013); In re Liquidation of Integrity Ins. Co., 193 N.J. 86, 94 (2007); Manalapan Realty, L.P. v. Twp. Comm. of Manalapan, 140 N.J. 366, 378 (1995).[2] For the reasons that follow, we conclude the applicants are not entitled to relief on any ground asserted.

## II. Facts

Daudelin was assigned to Newark's AIU in 1984 and served in that unit for about sixteen years before retiring in 2000; he first applied for a special carry permit in April 2011. Wheeler was assigned to the AIU in 1997 and retired with no more than eleven years of service in 2008; he filed this application for a special permit in February 2011.[3] Both held leadership positions and retired in good standing.

---

[2] The Attorney General participated in the Law Division but, regrettably, declined to participate here. This matter implicates criminal laws, involves a determination of the Division and presents constitutional challenges to State statutes. The Attorney General is the State's Chief Law Enforcement Officer, N.J.S.A. 52:17B-98; the head of the Department of Law and Public Safety and generally responsible for the Division, N.J.S.A. 52:17B-2 to -4; and is entitled to defend a challenge to a statute, R. 4:28-4; R. 2:5-1(h).

[3] This was Wheeler's second application. On a prior appeal decided before Casaleggio, we upheld a denial of his first

(continued)

Acknowledging their ineligibility for special permits, they offered evidence to demonstrate that their exclusion from the list of eligible retirees is arbitrary. Active members of an AIU have powers equivalent to those of police officers only "while engaged in the actual performance of arson investigation duties," N.J.S.A. 40A:14-7.1d, and may carry handguns only "while either engaged in the actual performance of arson investigation duties or while actually on call to perform arson investigation duties and when specifically authorized . . . to carry weapons." N.J.S.A. 2C:39-6a(8) (emphasis added).[4] But these applicants were on duty or on call except when on vacation, and they intervened whenever they observed crimes in progress, even crimes unrelated to their duties, and they worked with officers from the police department, county prosecutor's

_____

(continued)
application for a special permit on the ground that AIUs are not among the agencies enumerated in subsection l, but we allowed Wheeler to reapply asserting eligibility as a LEOSA-qualified retired officer. In the Matter of Jonathan R. Wheeler, No. A-3329-08 (App. Div. Nov. 20, 2009) (slip op. at 7-10). The Division and the Law Division relied on Casaleggio to deny his second application. As the parties agree that Casaleggio is rightly decided, that question is not before us.

[4] Firefighters not assigned to an AIU have police powers only while en route to, attending to or returning from a fire, and they have no authority to carry firearms beyond that of private citizens. N.J.S.A. 40A:14-54.

office and the Bureau of Alcohol, Tobacco and Firearms when investigating arsons related to other crimes.

They also presented evidence of inconsistent application of the special carry permit law. Some AIU retirees had been issued special carry permits based on subsection *l*'s reference to LEOSA, but they received those permits prior to this court's decision in Casaleggio.

Neither Wheeler nor Daudelin made any attempt to establish the "justifiable need" necessary to obtain an ordinary carry permit. Instead, they argued that if retired officers, who have no police powers, can obtain a carry permit without showing "justifiable need," then no one should be required to make that showing.

### III. The Firearms Law

Discussion of the constitutional challenges to the "justifiable need" component of the carry permit law requires an understanding of the role of "justifiable need" in the "'careful grid' of regulatory provisions" comprising our firearms law. Preis, supra, 118 N.J. at 568 (quoting State v. Ingram, 98 N.J. 489, 495 n.1 (1985)). Accordingly, the importance of this component of that grid is best understood in context.

The carry permit law is distinct from laws that provide enhanced punishment for persons who commit crimes with guns or

other deadly weapons, which are also part of the careful grid. Id. at 568-69. As the discussion that follows demonstrates, the carry permit law is one of the regulatory provisions of the firearms laws designed to protect the public before any harm is caused. The regulatory provisions address the danger of serious injury inherent in the ownership and carrying of firearms.

**A. The Purpose, Requirements, Narrow Scope and Role of the Carry Permit Law**

**1. The Purpose and Requirements**

Some regulatory provisions of the firearms laws "keep firearms from all such persons whose possession would pose a threat to the public health, safety or welfare," under any circumstance. Burton v. Sills, 53 N.J. 86, 93 (1968), appeal dismissed, 394 U.S. 812, 89 S. Ct. 1486, 22 L. Ed. 2d 748 (1969). In order to lawfully acquire a handgun, rifle or shotgun, one must demonstrate that he or she is not disqualified by reason of youth, criminal record history, domestic violence restraining order or disability affecting one's ability to carry a firearm. N.J.S.A. 2C:58-3a-c (requiring prior authorization - a permit to purchase a handgun or a purchaser identification

card for rifles and shotguns — and enumerating the disqualifying conditions).[5]

The carry permit law serves a different purpose — addressing the "serious dangers of misuse and accidental use" inherent even when the person carrying a handgun is law-abiding and responsible. Siccardi, supra, 59 N.J. at 558 (construing N.J.S.A. 2A:151-44 (L. 1966, c. 60, § 35, p. 501)). An applicant for a carry permit must demonstrate more than absence of a disqualifying condition. The applicant must show that he or she is "thoroughly familiar with the safe handling and use of handguns" and that he or she has "a justifiable need to carry a handgun." N.J.S.A. 2C:58-4d. These two additional requirements make the carry permit "the most closely-regulated aspect of [this State's] gun-control laws." Preis, supra, 118 N.J. at 568-69.

The additional requirements minimize the danger the carry permit law is intended to address. The showing of proficiency reduces the risk of mishandling. Moore v. Madigan, 702 F.3d 933, 941 (7th Cir. 2012) (noting the obvious menace when the untrained carry guns in public), reh'g en banc denied, 708 F.3d

---

[5] N.J.S.A. 2C:39-10a(1) (violation of this restriction is a crime of the fourth degree); N.J.S.A. 2C:39-5c (violation is a crime of the third degree where an exemption stated in N.J.S.A. 2C:39-6 does not apply); see also N.J.S.A. 2C:58-3.1, -3.2 (exempting certain temporary transfers).

901 (7th Cir. 2013). And the demonstration of particularized need that serves to limit "widespread handgun possession in the streets, somewhat reminiscent of frontier days, would not be at all in the public interest." Siccardi, supra, 59 N.J. at 558.

### 2. The Narrow Scope

Although the carry permit is the most closely-regulated aspect of our firearms laws, it affects a very narrow range of conduct.

The core of the carry permit law is a broadly-stated prohibition against knowing possession of a handgun "without first having obtained a permit to carry the same as provided in N.J.S. 2C:58-4." N.J.S.A. 2C:39-5b(1). But the scope of that prohibition, and consequently the obligation to establish "justifiable need" in order to carry and use a handgun, is greatly diminished by numerous statutory exceptions that make N.J.S.A. 2C:39-5b inapplicable in a wide range of circumstances. See N.J.S.A. 2C:39-6 (codifying the exceptions).

As a practical matter, the exceptions make the prohibition against carrying a handgun applicable only in public places. We use the term "public places" throughout this opinion to mean places other than one's home, business premises, property, places where handguns are lawfully sold and repaired, and places where handguns may be lawfully used for training and practice or

A-3704-11T4

recreationally for hunting, competition and exhibition.

N.J.S.A. 2C:39-6e, f, g. Because of the exceptions, one does not need a carry permit to keep, carry or use a handgun about one's home, business premises or land, N.J.S.A. 2C:39-6e, or while lawfully hunting or shooting at a range or in an authorized exhibition, N.J.S.A. 2C:39-6f(1)-(3), or while transporting a handgun, unloaded and secured, between those places and places where guns are sold or repaired. N.J.S.A. 2C:39-6e, f, g.

In each of the instances covered by the foregoing exceptions, a lawful reason, or need, for having a handgun is obvious: keeping or transporting a handgun for lawful use; using it in lawful defense of home, family and property; using it recreationally or for training where that conduct is lawful; and transporting it, secured, in connection with acquisition, maintenance or use for one of the lawful purposes.

There are additional exceptions that apply to certain persons carrying a loaded handgun in public places. Those eligible are designated by their employment. N.J.S.A. 2C:39-6a, b. Where those exceptions apply, the likely need for use of lawful defensive force is apparent — either because the persons or things the employee must secure are inherently likely to be of interest to those bent on crime, or because the job is to

keep the peace, prevent crime, apprehend, secure or prosecute suspects, or supervise and secure those convicted.

The employment-based exceptions applicable to workers in the private sector are for guards employed by railway express companies, banks, public utilities transporting explosives, nuclear power plants or companies transporting prisoners pursuant to government contract. N.J.S.A. 2C:39-6c(5), a(10), c(8), c(15). Exempted government employees are members of the military on active duty, police and sheriffs' officers, prison and jail guards, parole officers, criminal investigators and prosecutors. N.J.S.A. 2C:39-6a(1)-(5), c(6), c(10)-(14), c(16).

Generally, the carrying privileges afforded to these exempt employees are strictly tied to performance of duties warranting the arming of the employees. See N.J.S.A. 2C:39-6a(10), c(5), c(8), c(15) (private sector); N.J.S.A. 2C:39-6a(1)-(2), a(6), a(7)(c), a(8), b(1), c(2), c(4), c(6), c(7) (public sector). The exceptions for some in the public sector are not limited to times when they are on duty or on call, but those officers have statutory duties and police powers not limited to performance of duty.[6]  Thus, the employment exemptions are tailored to need.

---

[6] Examples of law enforcement officers with broad privileges and police powers are provided in footnote 8.

Employment-based exemptions are also conditioned on demonstration of competence in handling firearms. Every exempt employee must successfully complete training and periodically re-qualify under standards set by the New Jersey's Police Training Commission (PTC). See N.J.S.A. 2C:39-6a, c (enumerating the exceptions); N.J.S.A. 2C:39-6j (requiring training and qualification). That condition minimizes the risk of misuse and accident.[7]

When the Legislature established the PTC in 1961, it recognized the need for better trained officers upon whom the public could rely. The Legislature determined that professional training for police was required "to better protect the health, safety and welfare of its citizens," in this "State whose population is increasing in relation to its physical area, and in a society where greater reliance on better law enforcement

_____

[7] The danger of widespread carrying of handguns has been cited in connection with expansion of officers' off-duty carrying privileges. See, e.g., Governor's Reconsideration and Recommendation Statement, Assembly No. 940, L. 1982, c. 154 (noting the "salutory" purpose of a Bill "intended to afford greater protection to the citizens of certain urban areas by permitting special police who live in those areas to carry weapons while off duty"; expressing concern about the "greater chance" of "mishap" resulting in harm to an "innocent civilian" inherent in arming off-duty special police who, unlike "[r]egular police," were not "specifically trained and tested to see how they will use a firearm under stress"; and conditioning gubernatorial approval on an amendment requiring additional training); N.J.S.A. 40A:14-146, L. 1982, c. 154, § 2, pp. 707-09 (incorporating the recommendation).

through higher standards of efficiency is of paramount need

. . . ."  N.J.S.A. 52:17B-66; L. 1961, c. 56, § 1, p. 542, (emphasis added).  This explanation demonstrates the Legislature's consistent focus on "need" in addressing the dangers of carrying handguns in public places.  In addition to regulating the carrying of handguns, it has made efforts to address conditions that could reasonably lead the public to perceive a need for being armed in public places.

All of the foregoing demonstrates the limited, but important, role that the carry permit law has in the grid of New Jersey's firearms laws — protection of those in public places of this densely populated State.  Despite the apparent breadth of the statute criminalizing the possession of a handgun without first obtaining a carry permit, N.J.S.A. 2C:39-5b, because of the numerous exceptions available where a good reason for having a handgun is apparent, N.J.S.A. 2C:39-6, a carry permit is necessary only if one wants to have a handgun where it cannot be lawfully used to do anything but repel an unlawful attack.  And where a person's employment gives reason to anticipate a need to use defensive force in places such as the highways, streets, sidewalks, alleys, parks and beaches of this densely populated State (where hunting and target shooting is not allowed),

exceptions exempt those employees from the obligation to obtain a carry permit.

### 3. The Similar Roles of Employment-Based Exemptions from the Carry Permit Law and the "Justifiable Need" Standard

In the context of the grid of our firearms laws, the "justifiable need" component of the carry permit law is best understood as accommodating, on a case-by-case basis, those who have a reason — one based on more than a generalized concern about the prevalence of crime — to anticipate a violent attack in a public place warranting lawful defensive use of a handgun. Siccardi, supra, 59 N.J. at 557; see, e.g., In re Application of "X", 59 N.J. 533, 534-35 (1971) (affirming denial of carry permit to a businessman because his "situation [did] not differ materially from those confronting many businessmen" and because he had not shown any "special dangers to him"). So viewed, carry permits available on a showing of "justifiable need" serve the same purpose as the categorical employment-based exceptions, which allow those the Legislature has recognized as having jobs likely to require lawful use of a handgun to carry them in public places if adequately trained.

There are other similarities between carry permits and the employment-based exemptions. Pursuant to N.J.S.A. 2C:58-4d, a carry permit may be tailored to the need established by the

applicant. A permit may "restrict the applicant as to the types of handguns . . . and for what purposes such handguns may be carried." N.J.S.A. 2C:58-4d. As previously noted, the employment-based exceptions are also tailored to need. For example, firefighters assigned to AIUs and charged with investigating suspicious fires and explosions, N.J.S.A. 2C:39-6a(8), have authority to carry handguns only while performing or being on call to perform those duties. In contrast, officers who have broader police powers even when off duty have equally broad carrying privileges. See, e.g., N.J.S.A. 2C:39-6a(7)(a); N.J.S.A. 2A:157-2.1 (officers of county or municipal police departments).

Moreover, consistent with the Legislature's attention to personal need, for example sport and defense of home, and need based on employment, for example guards and police officers, the obligation to show "justifiable need" can be established in two ways — a particularized individual need or a particularized need related to employment. As previously noted, applicants for carry permits generally must show "'an urgent necessity . . . for self-protection'" by pointing to "specific threats or previous attacks demonstrating a special danger to the applicant's life that cannot be avoided by other means." Preis, supra, 118 N.J. at 571 (quoting Siccardi, supra, 59 N.J. at

557).  But carry permits are also available to individuals employed in businesses licensed by the State if they can show: "(1) that . . . in the course of performing statutorily-authorized duties, [they are] subject to a substantial threat of serious bodily harm; and (2) that carrying a handgun is necessary to reduce the threat of unjustifiable serious bodily harm to any person."  Id. at 576-77; see N.J.A.C. 13:54-2.4(d) (codifying the standards stated in Preis).

The final similarity is related to the Legislature's focus on the risk inherent in the carrying of handguns in public. Both exempt employees and applicants for carry permits must acquire training necessary to minimize the risk that misuse and accidental use of handguns poses to others.  The PTC-approved training for exempt employees has been discussed above.  The regulation adopted to give content to the showing of "thorough familiarity with the safe handling of handguns" that must be made by an applicant for a carry permit, N.J.S.A. 2C:58-4d, also requires comparable training in the lawful use as well as the proficient use of handguns.  N.J.A.C. 13:54-2.4(b) (1. firearms training substantially equivalent to that approved by the PTC as described in N.J.S.A. 2C:39-6j; 2. recent qualification scores; and 3. a passing score on a test measuring knowledge of laws "governing the use of force").

We do not minimize the significance of the "justifiable need" requirement where it applies. Regardless of training and absence of a disqualifying condition, a well-trained and wholly law-abiding and responsible person cannot lawfully carry a firearm in a public place unless that person can demonstrate that he or she has "a justifiable need to carry a handgun." N.J.S.A. 2C:58-4d. This important component of the law is unmistakably designed to prohibit the public carrying of firearms unless the person has a "justifiable need" for being armed.

### 4. The Role of Special Permits for Retired Police Officers

The role of special permits for designated retired law enforcement officers is less apparent. The Legislature's authorization of special carry permits for these retirees pursuant to subsection *l* of N.J.S.A. 2C:39-6 appreciably relaxes the "justifiable need" standard. These special permits were first authorized in 1997. L. 1997, c. 67, § 1 (adding subsection *l* to N.J.S.A. 2C:39-6). Before that all retired law enforcement officers, like others without police powers or an express statutory employment-based exemption, had to show "justifiable need" to be authorized to carry a handgun in public places under one of the standards enunciated in Preis.

The absence of a "justifiable need" requirement for these statutorily designated retirees was intended. A statement accompanying the 1997 legislation states: "Retired law enforcement officers are afforded no special treatment under current law. In order to carry a handgun after retirement, a retired officer, just like any other citizen, must establish a 'justifiable need' to carry a handgun pursuant to [N.J.S.A.] 2C:58-4." Assembly Law & Public Safety Committee Statement to Assembly Committee Substitute for A. 1762, A. 1834, A. 949 (May 13, 1996) (enacted as L. 1997, c. 67, § 1).

Some basis for the special treatment can be inferred from the officers' pre-retirement duties, police powers and carrying privileges. Subsection l designates ten categories of retired law enforcement officers eligible for special permits. Eight of the ten are designated by reference to employment with state, interstate and local law enforcement agencies. N.J.S.A. 2C:39-6l. Prior to retiring, full-time officers in the designated agencies had police powers that were not limited to the time or place of duty and their duties were not tied to investigation of narrow categories of crime, like the investigation of suspicious fires and explosions.[8] N.J.S.A. 40A:14-7.1d. As previously

_____

[8] The listing that follows includes the eight groups listed with citations to the statutes stating their carrying privileges and
(continued)

discussed, however, retirees who served in AIUs are ineligible, but they, like many other ineligible retirees, had carrying privileges while employed that were tied to actual performance of duties.[9]  The alignment is not perfect because some retirees with broad authorization to carry weapons while employed are ineligible for a special permit.  But the converse is not true; no retiree with limited authority to carry while employed is eligible.

---

(continued)
police powers prior to retirement.  They are those retirees who served "full-time" and "regularly" in 1) the State Police, N.J.S.A. 2C:39-6a(3) and N.J.S.A. 53:2-1; 2) an interstate police force, N.J.S.A. 2C:39-6a(7)(a), see, e.g., N.J.S.A. 32:2-25 (setting forth the police powers of members of the Port Authority of New York and New Jersey's police force); 3) a county or municipal police department in this State, N.J.S.A. 2C:39-6a(7)(a) and N.J.S.A. 2A:157-2.1; 4) a State law enforcement agency, N.J.S.A. 2C:39-6a(4) and N.J.S.A. 52:17B-100.1; 5) a sheriff, undersheriff or sheriff's officer of a county of this State, N.J.S.A. 2C:39-6a(4) and N.J.S.A. 2A:157-2.1; 6) a State or county corrections officer, N.J.S.A. 2C:39-6a(5), (11) and N.J.S.A. 2A:154-3, -4; 7) a county park police officer, N.J.S.A. 2C:39-6a(7)(a) and N.J.S.A. 40:37-155; and 8) a county prosecutor's detective or investigator, N.J.S.A. 2C:39-6a(4) and N.J.S.A. 2A:157-10.  See N.J.S.A. 2C:39-6*l*.

[9] Among the ineligible officers are: civilian employees of the United States Government; special agents of the Division of Taxation; deputy conservation officers; employees of the Division of Parks and Forestry who have the power of arrest; court attendants; and officers of the Society for the Prevention of Cruelty to Animals.  N.J.S.A. 2C:39-6a(6),(7); N.J.S.A. 2C:39-6c(1),(2),(4),(7) (defining their respective limited authorization to carry handguns while employed).

The two remaining categories of retirees eligible for special permits are those who were "full-time federal law enforcement officer[s]" and those domiciled in this State who are eligible as a retiree who is "a qualified retired law enforcement officer" within the meaning of that term as it was defined in LEOSA when adopted in 2004. N.J.S.A. 2C:39-6*l*. As these applicants were not federal officers and acknowledge their ineligibility under subsection *l*'s reference to LEOSA, these categories have no relevance to them.[10]

Two reasons for special permits for retirees consistent with the "justifiable need" requirement are suggested in the legislative record developed by the congressional committee that released LEOSA. Those reasons are that: 1) arming retirees who are trained and experienced law enforcement officers is a means of preventing crime; and 2) such retirees and their families face a risk of retaliatory criminal violence to which others are not exposed. See H.R. Rep. No. 108-560, accompanying H.R. 218, 108th Congress 2d Session (then entitled the "Law Enforcement Officers Safety Act of 2003" and adopted on July 22, 2004 as

---

[10] Since its adoption in 1997, subsection *l* has been amended to make special carry permits more readily available: the reference to LEOSA-qualified retirees domiciled here was added; the age limit for eligibility was raised; and the requirement to apply within six months after retirement was eliminated. Compare L. 1997, c. 67, § 1 with L. 2007, c. 313, § 1.

P.L. 108-277, the "Law Enforcement Officers Safety Act of 2004").[11]

It is unlikely that our Legislature was primarily focused on the public benefits of arming retired law enforcement officers. While private persons may lawfully use force to protect a third person from imminent harm threatened by one using unlawful force, N.J.S.A. 2C:3-5, they have limited authority to use force to effect an arrest. N.J.S.A. 2C:3-7. The Legislature likely focused on the risk of retaliation faced by these retirees — that threat distinguishes them from others. And the Legislature could have distinguished these retirees from other well-trained persons based on their experience in assessing street crime and the need for lawful force, on and off duty, prior to retirement.[12]

_____

[11] A section of that congressional report, explains that the organizations of rank and file officers supporting the proposal viewed it as "allow[ing] tens of thousands of additionally equipped, trained and certified law enforcement officers to continually serve and protect our communities" and allow active and retired officers "to defend themselves . . . from criminals whom they have arrested." Id. at 4. The views of the committee members opposing and supporting the measure and the adequacy of the justifications for it are also set forth in the report. Notably, there was no discussion of arming all law-abiding citizens with comparable training.

[12] The other two branches of government considered experience and training in connection with off-duty carrying privileges afforded in the employment-based exceptions for law enforcement
(continued)

### 5. The Legislature's "Justifiable Need" Requirement is Consistent with the Lawful Defensive Use of Firearms

The Legislature has determined that the presence of readily accessible handguns in public places of this densely populated State presents an inherent risk of serious injury from accident and misuse.  The risk of accident and misuse in public places of this State where a carry permit is required is enhanced — if for no other reason than a handgun poses a greater danger in public than it would if left at home.  Moore, supra, 702 F.3d at 937.  The use of force to repel an attack or a perceived threat of attack is not lawful if the actor negligently or recklessly creates a risk of injury, causes injury to a non-aggressor or causes injury based on an unreasonable perception of the necessity or lawfulness of the force.  See N.J.S.A. 2C:11-4a(1), b(1); N.J.S.A. 2C:12-1a(1)-(2), b(1); N.J.S.A. 2C:3-4 to -5 (requiring a reasonable assessment of threat and its immediacy); N.J.S.A. 2C:3-9 (making justifications for the use of defensive

_____

(continued)
officers.  See Governor's Reconsideration and Recommendation Statement, Senate No. 1480, L. 1985, c. 150 (explaining that because AIU members do not receive training comparable to that of municipal police officers, their police powers should be limited to times when "they are actually performing arson investigation duties" and their carrying privileges limited to times when they are actually performing, or are on call to perform, their duties); L. 1985, c. 150, § 1, pp. 473-74 (following the Governor's recommendations).

force unavailable where the actor is mistaken about the law or recklessly or negligently injures a bystander).

**B. The History of the Carry Permit Law**

We address the history of the carry permit law only because of the importance history has under the United States Supreme Court's recent interpretations of the Second Amendment, which we discuss in Part IV of this opinion. That history is discussed in both Siccardi and Preis.

The first measure addressing the danger of carrying firearms was adopted in 1882, and it applied only to youngsters. L. 1882, c. IV, §§ 2-4; Siccardi, supra, 59 N.J. at 553. The first carry permit law was enacted in 1905. L. 1905, c. 172, § 43a, p. 324. It prohibited possession of concealed weapons in public places by anyone who did not hold exempt employment or have a carry permit. Ibid. The 1905 law did not provide a standard for the issuance of carry permits; it left that to the discretion of the mayor or township committee. Ibid.

The Legislature first limited issuance of carry permits to those who could demonstrate "need" in 1924, and at the same time it assigned final responsibility for assessing need to judges. L. 1924, c. 137, § 2, pp. 305-06. The Supreme Court has concluded that the Legislature's involvement of the judiciary signals the importance legislators place on "the dangers

24

inherent in carrying handguns and the urgent necessity for their regulation." Preis, supra, 118 N.J. at 576; see Siccardi, supra, 59 N.J. at 553. Since 1924, all iterations of the carry permit law have continued those critical elements. See, e.g., L. 1924, c. 137, § 1, p. 305; L. 1966, c. 60, § 34, pp. 499-501 (N.J.S.A. 2A:151-41). Even when the Legislature extended the law to require carry permits for pistols and revolvers, whether carried openly or concealed, the Legislature left the need standard intact. L. 1966, c. 60, § 34, pp. 499-501 (N.J.S.A. 2A:151-41).

The Legislature changed the label from "need" to "justifiable need" when it codified the criminal laws and the firearms laws in Title 2C. But the Legislature did not alter the substance of the standard as interpreted in Siccardi. Preis, supra, 118 N.J. at 570; see Siccardi, supra, 59 N.J. at 557 (construing L. 1966, c. 60, § 35, pp. 501-02 (N.J.S.A. 2A:151-44)); II Final Report of the New Jersey Criminal Law Revision Commission, The New Jersey Penal Code: Commentary § 2C:58-4 at 370 (1971) (noting the drafters' intention to continue to current law).

In short, limiting the possession of handguns in public places to those who have a "justifiable need" for carrying them is a longstanding measure and one long understood as essential

to addressing the dangers of misuse and accidental use.  As early as 1925, a three-judge panel considered a Second Amendment challenge to the 1924 law and rejected a defendant's claim that these measures impermissibly burdened his right.  State v. Angelo, 3 N.J. Misc. 1014, 1014 (Sup. Ct. 1925).  The panel assumed, without discussion, that Amendment applied and afforded an individual right.  The panel succinctly stated these reasons for concluding the law did not violate the Amendment:

> The right of a citizen to bear arms is not unrestricted.  The state government, in the exercise of its police power, may provide such conditions precedent to the right to carry concealed weapons as the safety and welfare of the people of the state in its judgment require.  The statute upon which the indictment was based is a valid exercise of the police power.
>
> [Id. at 1015.]

### C. The Factual Justifications for the Carry Permit Law

The factual basis for the New Jersey Legislature's longstanding perception of the danger inherent in widespread handgun possession in public places was addressed in Siccardi and based on evidence presented in the Law Division.  Because the Court discussed that evidence in Siccardi, there is no reason to provide more than a brief summary here.  59 N.J. at 549-53.

The evidence included testimony from several chiefs of police departments in urban and suburban municipalities and from a representative of the New Jersey Division of State Police. None of the officers were aware of any instance in which a citizen had used a firearm to thwart an attack or successfully defend himself in a public place, and several officers were of the opinion that handguns had limited utility in preventing public attacks because such attacks are sudden, unexpected, brief and made at a time the attacker deems advantageous. Id. at 550-52. The Court also considered a report prepared for the National Commission on the Causes and Prevention of Violence (NCCPV), in which the authors concluded that there was no data establishing the value of firearms as a defense against attack on the street, but recognized that there was evidence that the ready accessibility of guns significantly increases the number of unpremeditated homicides and the seriousness of the injuries sustained in assaults. Id. at 552. The Court quoted a portion of the NCCPV's recommendations suggesting federal legislation encouraging states to limit handgun ownership "'to police officers and security guards, small businesses in high crime areas, and others with a special need for self-protection.'" Ibid. (quoting Final Report, National Commission on the Causes and Prevention of Violence, p. 181 (1969)). And, the Court

A-3704-11T4

cited numerous law review articles addressing gun control laws and their efficacy.  Id. at 552-53.

The Legislature also considered evidence before amending the carry permit law in 1966 to cover the open, as well as the concealed, carrying of pistols and revolvers.  See Assembly Committee on State Government, Public Hearing on Assembly Bill A-165, "an Act concerning firearms and other dangerous weapons and revising, repealing and supplementing parts of the statutory law," Mar. 2, 1966.  That evidence is not discussed in Siccardi. Although the hearing is fairly characterized as spirited, the proposed extension of the carry permit law to reach unconcealed handguns drew little comment.

The then Attorney General, Arthur J. Sills, advised that the F.B.I. Uniform Crime Reports for 1964 showed that "96 per cent of the 225 police officers slain [between 1960 and 1964] were killed with firearms."  Id. at 8.  The Attorney General also compared the rate at which homicides were committed with firearms in cities that did and did not have strict gun control laws.  Id. at 11-12.  In New York City, where the state gun control laws were, in the Attorney General's view, strict, "[o]f the 637 homicides . . . in 1964, firearms were used in 26 per cent of the cases."  Id. at 11.  In Texas, which in his view had

very little gun control, "firearms were involved in 72 per cent of all murders in 1963 in Dallas." Ibid.

The focus of the proponents and the opponents of the legislative reform was on new measures concerning acquisition, not the carrying of firearms. Id. at 2-7, 18-20. The disputes centered on measures like finger-printing and record-keeping and aimed at keeping firearms from the irresponsible and violators of law. Id. at 2-7, 19-21. In the Attorney General's view those measures were the major thrust of the reform. Id. at 2, 7. With respect to carry permits, he simply noted that permits would be "required as under present law." Id. at 5.

Secretary L. Arthur Burton spoke for a "Citizens Committee for Firearms Legislation," which was comprised of "fifteen individuals" representing local and national associations that were then "the major sporting and shooting organizations in the State." Id. at 17-18. Mr. Burton implicitly endorsed the prohibition against the public carrying of revolvers and pistols without a carry permit by noting his Committee's support for proposed restrictions on transporting loaded and uncased pistols and revolvers. Id. at 27. The only objection to carry permits he voiced were: 1) that the Bill, as then drafted, might be understood to require a carry permit for rifles and shotguns; and 2) that the obligation to "demonstrate familiarity with" and

"sufficient skill and knowledge" of handguns was meaningless without prescribed standards. Id. at 21-22, 24.

Similarly, a member of the Executive Committee of the Directors of the National Rifle Association, Louis A. Benton, testified in opposition to some aspects of the proposed reform. He did not comment on carry permits or the prohibition against carrying a pistol or revolver openly without one. Id. at 54-60.

Another witness, the operator of a licensed detective agency, mentioned the "need" component of the carry permit law, but he simply suggested addition of a standard for assessing the "need of the applicant," id. at 78A-79A, which the Court supplied in Siccardi. He also urged an amendment that would add a new exception — one he viewed as a trade off for the new limitation on carrying openly — for persons in "fresh pursuit of a criminal, in the act of preventing a crime, defending [themselves] against a crime, and attempting to apprehend a criminal." Id. at 78A.

For the most part, no change in the permit law was required to address the detective's concerns. As a matter of law, in "those rare and momentary circumstances where an individual arms himself spontaneously to meet an immediate danger," self-defense and defense of others are viable defenses to possession in violation of a regulatory offense, like the carry permit law.

State v. Harmon, 104 N.J. 189, 208-09 (1986).  In contrast, "the policies embodied in our gun control laws, N.J.S.A. 2C:39-3 and -5, [do] not allow self-defense as an excuse or justification to a charge of unlawful possession under a regulatory offense when a person arms himself prior to a danger becoming imminent." Ibid. (discussing cases decided under laws of the District of Columbia, Maryland, Tennessee and Texas reaching the same conclusion).

**D.  Summary**

Some might argue, as these applicants do, that the "justifiable need" requirement is unnecessary to prevent the danger of misuse and accidental use inherent in the widespread carrying of handguns in public places of this densely populated State.  In their view, limiting carry permits to law-abiding and responsible persons with adequate training is enough.  But the wisdom of this policy choice involves a predictive judgment of the Legislative and Executive Branches to make in furtherance of one of the government's primary obligations — the safety of the public.  United States v. Salerno, 481 U.S. 739, 745, 107 S. Ct. 2095, 2100, 95 L. Ed. 2d 697, 707-08 (1987).

The only question for us is whether conditioning the issuance of carry permits on a showing of "justifiable need" is

A-3704-11T4

a step the Second Amendment allows.  With the foundation for that inquiry now in place, we turn to consider the question.

## IV. The Second Amendment

### A. The Claim Presented

These applicants argue that New Jersey's "justifiable need" requirement makes carry permits "unobtainable by all but a few applicants," rendering the right to use a handgun in lawful self-defense "illusory" and, thereby, violative of their Second Amendment right.  The weight of authority is against them.

New Jersey's law is far from unique.  Hawaii,[13] Maryland,[14] Massachusetts,[15] New York,[16] and Rhode Island[17] similarly condition the carrying of handguns on a showing of particularized need.[18]

---

[13] Authorizing issuance "[i]n an exceptional case, when an applicant shows reason to fear injury to the applicant's person or property . . . ."  Haw. Rev. Stat. § 134-9(a).

[14] Maryland conditions issuance on "good and substantial reason to wear, carry or transport a handgun . . . as a reasonable precaution against apprehended danger," which cannot be established by "the applicant's vague apprehensions of danger and personal anxiety over the crime situation."  Scherr v. Handgun Permit Review Bd., 880 A.2d 1137, 1140, 1144 (Md. Ct. Spec. App. 2005).

[15] "[G]ood reason to fear injury to his person or property, or . . . any other reason, including the carrying of firearms for use in sport or target practice."  Mass. Gen. Laws ch. 140, § 131(d); Ruggiero v. Police Comm'r of Boston, 464 N.E.2d 104, 108 (Mass. App. Ct. 1984) (assertion of a perception of being a victim of crime is inadequate).

Other courts have considered and, with the exception of one whose decision was reversed on appeal, uniformly rejected challenges to laws that condition the issuance of carry permits on an objective showing of a need different than that of the general populace.  Drake v. Filko, 724 F.3d 426, 440 (3d Cir. 2013) (New Jersey); Woollard v. Gallagher, 712 F.3d 865, 875-76 (4th Cir. 2013) (Maryland), cert. denied, 187 L. Ed. 2d 281 (U.S. Oct. 15, 2013); Kachalsky v. Cnty. of Westchester, 701 F.3d 81, 92 (2d Cir. 2012) (New York), cert. denied, sub nom. Kachalsky v. Cacace, ___ U.S. ___, 133 S. Ct. 1806, 185 L. Ed. 2d 812 (2013); Young v. Hawaii, 911 F. Supp. 2d 972, 989 (D.

(continued)
[16] New York's law conditions issuance of general carry permits on a "proper purpose," which is demonstrated by showing a "'special need for self protection distinguishable from that of the general community or of persons engaged in the same profession.'"  Kachalsky v. Cnty. of Westchester, 701 F.3d 81, 92 (2d Cir. 2012) (quoting Klenosky v. N.Y. City Police Dep't, 428 N.Y.S.2d 256 (N.Y. App. Div. 1980), aff'd o.b., 421 N.E.2d 503 (1981)).

[17] "[G]ood reason to fear an injury to his or her person or property or has any other proper reason for carrying a pistol or revolver . . . ."  R.I. Gen. Laws § 11-47-11(a).

[18] We have not undertaken an exhaustive survey of laws in other states, because our point is simply that New Jersey's law is not unique.  Moreover, it is apparent, from a review of California law that firearms laws may be drafted differently to effectively limit the carrying of loaded firearms in public places to circumstances where the person has a special need for using them defensively.  See Cal. Penal Code §§ 25850(a), 26045, 26050; Peruta v. Cnty. of San Diego, 758 F. Supp. 2d 1106, 1115 (S.D. Cal. 2010) (rejecting Second Amendment challenge).

Haw. 2012); Williams v. State, 10 A.3d 1167, 1169 n.2, 1177 (Md.), cert. denied, ___ U.S. ___, 132 S. Ct. 93, 181 L. Ed. 2d 22 (2011).  A panel of this court has reached the same conclusion, and the question is now pending before our Supreme Court on a grant of certification.  In re Pantano, 429 N.J. Super. 478, 486-90 (App. Div.), certif. granted, 214 N.J. 235 (2013); cf. Mosby v. Devine, 851 A.2d 1031, 1047-48 (R.I. 2004) (rejecting a challenge under Rhode Island's constitution); but cf. Moore v. Madigan, 702 F.3d 933, 941-42 (7th Cir. 2012) (majority opinion invalidating an Illinois law prohibiting the carrying of handguns in public places without allowing for issuance of permits on a showing of proper cause), reh'g en banc denied, 708 F.3d 901 (7th Cir. 2013) (over the dissent of four judges).

Our discussion of the Second Amendment challenge is informed by the foregoing persuasive, albeit non-binding, precedents.  In re Contest of Nov. 8, 2011 Gen. Election of Office of N.J. Gen. Assembly, 210 N.J. 29, 45 (2012).  And, for the reasons that follow, we conclude that New Jersey's law does not violate the Second Amendment.

**B. The Right**

The Second Amendment provides: "A well regulated Militia, being necessary to the security of a free State, the right of

34

the people to keep and bear Arms, shall not be infringed."  U.S. Const., amend. II.  There is no longer any serious question that "the Second Amendment right is fully applicable to the States" and their political subdivisions; a majority of the United States Supreme Court concluded that it is in McDonald v. City of Chicago, ___ U.S. ___, ___, 130 S. Ct. 3020, 3026, 177 L. Ed. 2d 894, 903 (2010).[19]  There is no question that the Second Amendment codifies a pre-existing individual right that is neither dependent upon membership in the militia nor "unlimited"; that was resolved in District of Columbia v. Heller, 554 U.S. 570, 580-81, 598-600, 603, 610, 626, 128 S. Ct. 2783, 2790-91, 2800-04, 2807-08, 2816-17, 171 L. Ed. 2d 637, 650-51, 661-62, 664-65, 668, 678 (2008).

### 1.  The Narrow Holdings in Heller and McDonald

The questions before the Court in Heller and McDonald were narrow, and their holdings are as well.  Heller involved challenges to the District of Columbia's laws effectively

---

[19] The only question is whether the states and their political subdivisions are bound by the Second Amendment through the Fourteenth Amendment's Privileges or Immunities Clause as Justice Thomas concluded, or through its Due Process Clause, as the plurality concluded.  Id. at ___, 130 S. Ct. at 3058-59, 177 L. Ed. 2d at 938-39 (Thomas, J., concurring).  Justice Scalia also concurred but wrote only to address a point raised in dissent.  Id. at ___, 130 S. Ct. at 3050, 177 L. Ed. 2d at 929 (Scalia, J., concurring).

"ban[ning] the possession of handguns in the home," and <u>McDonald</u> involved challenges to "similar" laws of the City of Chicago and one of its suburbs.  <u>McDonald</u>, <u>supra</u>, ___ <u>U.S.</u> at ___, 130 <u>S. Ct.</u> at 3026, 177 <u>L. Ed.</u> 2d at 903.

Adopting the "original understanding" of the Second Amendment in <u>Heller</u>, the Court held that "the District's ban on handgun possession in the home violates the Second Amendment, as does its prohibition against rendering any lawful firearm in the home operable for the purpose of immediate self-defense."  554 <u>U.S.</u> at 635, 128 <u>S. Ct.</u> at 2821-22, 171 <u>L. Ed.</u> 2d at 683-84.  In <u>McDonald</u>, the Court held that the Second Amendment right "recognized in <u>Heller</u>" is applicable to the states and described it as "the right to possess a handgun <u>in the home</u> for purpose of self-defense."  ___ <u>U.S.</u> at ___, 130 <u>S. Ct.</u> at 3050, 177 <u>L. Ed.</u> 2d at 929 (emphasis added).

The Supreme Court also linked the Amendment's protection to the home when explaining why the District's laws could not withstand scrutiny under any standard applied to enumerated rights.  <u>Heller</u>, <u>supra</u>, 554 <u>U.S.</u> at 628, 128 <u>S. Ct.</u> at 2817-18, 171 <u>L. Ed.</u> 2d at 679.  The Court reasoned that the home is the place "where the need for defense of self, family, and property is most acute" and that the District's laws made "it impossible for citizens to use [handguns] for the <u>core</u> lawful purpose of

A-3704-11T4

self-defense."  Id. at 628-30, 128 S. Ct. at 2817-18, 171 L. Ed. 2d at 679-80 (emphasis added) (quoted in part in McDonald, supra, ___ U.S. at ___, 130 S. Ct. at 3036, 177 L. Ed. 2d at 914-15).

### 2.  The Broad Reasoning Supporting the Narrow Holdings in Heller and McDonald

Despite the narrow holdings, the Court's reasoning in Heller and McDonald suggests that the Second Amendment's protection extends beyond the home.  In considering the Amendment's text as it would have been understood by the voters approving it, the historical background, and the 19th century understanding of the Amendment's scope,[20] id. at 576-619, 128 S. Ct. at 2788-2812, 171 L. Ed. 2d at 648-74, the Court discerned that the individual right protected is a right "to possess and carry weapons in case of confrontation"; the "central component" of which is "self-defense"; a right "to bear arms for defensive purposes"; and a right "to use arms for self-defense."  Id. at 592, 599, 602, 672, 128 S. Ct. at 2797, 2801, 2803, 2811, 171 L. Ed. 2d at 657, 662-63, 672; see also id. at 599, 128 S. Ct. at 2801, 171 L. Ed. 2d at 662 (noting at the time the Amendment was

---

[20] The Court explained that 19th century understandings of the Second Amendment's scope are informative on the "original" understanding because they reflect "the public understanding of a legal text in the period after its enactment."  Id. at 605, 128 S. Ct. at 2805, 171 L. Ed. 2d at 665.

adopted "most undoubtedly thought [the right] even more important for self-defense and hunting" than for membership in the militia) (emphasis added).

In McDonald, the Court referred to Heller's broad reasoning.  Indeed, in the opening paragraph Justice Alito states that the Heller Court held that the "Second Amendment protects the right to keep and bear arms for the purpose of self-defense."  ___ U.S. at ___, 130 S. Ct. at 3026, 177 L. Ed. 2d at 903.  Elsewhere Justice Alito stated, "the Second Amendment protects a personal right to keep and bear arms for lawful purposes, most notably for self-defense within the home." Id. at ___, 130 S. Ct. at 3044, 177 L. Ed. 2d at 922 (emphasis added); cf. id. at ___, 130 S. Ct. at 3050, 177 L. Ed. 2d at 929 (Justice Alito's narrower description of the "right recognized in Heller," which is quoted above).

### 3.  The Threshold Question Raised by the Court's Narrow Holdings and Broader Reasoning

Several courts considering challenges to laws that restrict the carrying of handguns outside the home have identified a threshold question — whether the Second Amendment as interpreted in Heller and McDonald protects any conduct in the public sphere.  They either reached different conclusions or avoided the question by assuming the Amendment applies.

A-3704-11T4

Declining to assign any greater significance to Heller and McDonald than the narrow holdings require, Maryland's High Court has upheld that State's law conditioning issuance of permits authorizing public carrying of handguns on a showing of "good and substantial reason" on the ground that it has no application to conduct in the home. Williams, supra, 10 A.3d at 1177 (noting that "[i]f the Supreme Court, in this dicta, meant its holding to extend beyond home possession, it will need to say so more plainly").

In contrast, focusing on the Court's broad reasoning in Heller and McDonald, the Seventh Circuit has concluded the right to "bear arms for self-defense" recognized in Heller is as important outside the home as inside." Moore, supra, F.3d at 935-36, 942. The majority concluded that Illinois' unique and absolute ban against carrying in public, applicable to all but law enforcement officers and guards, went too far. Id. at 941-42.

Other courts, addressing carry permits issued only on a particularized showing of need to have one in public places for self-defense, have left the question unresolved. They have concluded that uncertainties about whether and how the Second Amendment right applies outside the home left by Heller and McDonald warrant caution. They have assumed there is a right to

A-3704-11T4

carry a handgun outside the home in the event of an encounter warranting its defensive use, and rejected challenges to these laws.  These courts have rejected the challenge on the ground that a law conditioning the issuance of a carry permit on a showing of need is not inconsistent with or does not impermissibly burden the right.  Drake, supra, 724 F.3d at 429-30, 433; Woollard, supra, 712 F.3d at 874, 876; Kachalsky, supra, 701 F.3d at 89, 93-94; see also United States v. Masciandaro, 638 F.3d 458, 475 (4th Cir.), cert. denied, ___ U.S. ___, 132 S. Ct. 756, 181 L. Ed. 2d 482 (2011).[21]

---

[21] In Masciandaro, the court described the open questions and its approach as follows:

> There may or may not be a Second Amendment right in some places beyond the home, but we have no idea what those places are, what the criteria for selecting them should be, what sliding scales of scrutiny might apply to them, or any one of a number of other questions. . . .  The notion that "self-defense has to take place wherever [a] person happens to be," Eugene Volokh, Implementing the Right to Keep and Bear Arms for Self-Defense: An Analytical Framework and a Research Agenda, 56 UCLA L. Rev. 1443, 1515 (2009), appears to us to portend all sorts of litigation . . . .  The whole matter strikes us as a vast terra incognita that courts should enter only upon necessity and only then by small degree.
>
> [638 F.3d at 475.]

The majority in Heller recognized it was leaving many questions unresolved. Justice Scalia explained, this "first in-depth examination of the Second Amendment," should not be "expect[ed] to clarify the entire field." Heller, supra, 554 U.S. at 635, 128 S. Ct. at 2821, 171 L. Ed. 2d at 683. The reasons for caution cut in both directions — a risk of extending the Second Amendment right beyond what the Heller Court intended, United States v. Skoien, 614 F.3d 638, 640 (7th Cir. 2010) (en banc), cert. denied, ___ U.S. ___, 131 S. Ct. 1674, 179 L. Ed. 2d 645 (2011), and a risk of reading Heller's discussion of the limited nature of the right too broadly and thereby improperly limiting Heller's intended scope, United States v. Marzzarella, 614 F.3d 85, 91 (3d Cir. 2010), cert. denied, ___ U.S. ___, 131 S. Ct. 958, 178 L. Ed. 2d 790 (2011). We agree that the principle of "constitutional avoidance" favors leaving constitutional issues that need not be decided for another day. Masciandaro, supra, 638 F.3d at 475.

Based upon the broad reasoning of Heller and McDonald, we think the Second Amendment right to carry a handgun for the purpose of lawful self-defense exists or extends beyond the home. Nevertheless, we have no reason to decide that question. We are confident that New Jersey's "justifiable need" standard

would not impermissibly burden the right. We can reject this challenge to the carry permit law on that ground.

Our conclusion that the "justifiable need" requirement is permissible rests on the Court's discussion of the limitations that are consistent with the original meaning of the Second Amendment.

### 4. Limitations on the Right

As the Supreme Court explained, "Like most rights, the right secured by the Second Amendment is not unlimited." Heller, supra, 554 U.S. at 626, 128 S. Ct. at 2816, 171 L. Ed. 2d at 678. The Amendment's scope is defined by the limitations and the license taken together. The Second Amendment right and other "[c]onstitutional rights are enshrined with the scope they were understood to have when the people adopted them, whether or not future legislatures or (yes) even future judges think that scope too broad." Id. at 634-35, 128 S. Ct. at 2821, 171 L. Ed. 2d at 683. The Amendment's scope is a "*product* of an interest balancing by the people," a balancing reflecting the limitations, as well as the protections, that were understood at the time of adoption — 1791. Id. at 635, 128 S. Ct. at 2821, 171 L. Ed. 2d at 683.

The Court did not attempt to define the complete or entire "product" of the original interest balancing. Instead it

explained, "[w]hatever else [the Amendment] leaves to future evaluation, it surely elevates above all other interests the right of law-abiding, responsible citizens to use arms in defense of hearth and home." Id. at 635, 128 S. Ct. at 2821, 171 L. Ed. 2d at 683 (emphasis added).

The Court's description of the "product" of original balancing includes two categorical limitations on the Amendment's scope that the Court deemed part of the original meaning. The irresponsible and the non-law abiding are excluded from the Amendment's protection, wherever they may be, even in the home. Indeed, the Court recognized the permissibility of these categorical exclusions of persons by including modern laws applicable to felons and the mentally ill in a partial listing of longstanding measures the Court declared to be "presumptively lawful." Id. at 626-27 & 627 n.26, 128 S. Ct. at 2816-17, 171 L. Ed. 2d at 678.

The Court identified other limitations similarly understood to be part of the pre-existing right. On its understanding of the original meaning, the Heller Court concluded that from the time preceding its adoption through the 19th century, the Second Amendment was not understood to be "a right to keep and carry any weapon whatsoever in any manner whatsoever and for whatever purpose." Heller, supra, 554 U.S. at 626, 128 S. Ct. at 2816,

171 <u>L. Ed.</u> 2d at 678, (quoted, in part, in <u>McDonald</u>, ___ at ___, 130 <u>S. Ct.</u> at 3047, 177 <u>L. Ed.</u> 2d at 926).

The Court went on to address limitations understood to leave some weapons, some manners of carrying them, and some purposes for carrying them outside the scope of the Amendment's prohibition.  The conclusions the Court drew based on laws in place around 1791 provide some guidance for courts considering challenges to the modern-day laws.  (We use the phrase "around 1791" as a shorthand for the years before and after 1791 that the Court deemed informative to the original understanding.)

With respect to "bearable" weapons, the Court concluded the Amendment protects those in common use at the time but not those "unusual" or "dangerous" weapons "not typically possessed by law-abiding citizens for lawful purposes."  <u>Heller</u>, <u>supra</u>, 554 <u>U.S.</u> at 625-27, 128 <u>S. Ct.</u> at 2816-17, 171 <u>L. Ed.</u> 2d at 677-79. Thus, the protection was not understood to extend to the keeping, carrying or using of weapons that were deemed "dangerous" or "unusual," in the sense that they were not typically used by the "law-abiding" and "responsible" for "lawful purposes."

Importantly, however, the Court looked to modern-day preferences in weapons in addressing the District of Columbia's restrictions on handguns.  Characterizing the claim "that only

those arms in existence in the 18th century are protected" as one "bordering on the frivolous," the Court concluded that the Amendment's protection "extends, prima facie" to "all instruments that constitute bearable arms, even those that were not in existence at the time." Id. at 582, 128 S. Ct. at 2791-92, 171 L. Ed. 2d at 651. In invalidating the District's laws effectively banning operable handguns from the home, the Court focused on the current popularity of handguns as the weapon of choice for self-defense. The Court did so with reference to evidence on the current popularity of handguns, not their popularity around 1791. Id. at 629-30, 128 S. Ct. at 680, 171 L. Ed. 2d at 2818-19; see id. at 628, 128 S. Ct. at 2818, 171 L. Ed. 2d at 679 (quoting Parker v. District of Columbia, 478 F.3d 370, 400 (D.C. Cir. 2007) (a case relying on Gary Kleck & Marc Gertz, Armed Resistance to Crime: The Prevalence and Nature of Self-Defense with a Gun, 86 J. Crim. L. & Criminology 150, 182-83 (1995), which addresses modern-day preferences to support the assertion)). We take this to mean that present-day considerations are relevant to interpretation of the original understanding — at least in this context of defining the class of bearable weapons that may be kept, carried and used.

With respect to limitations on the purpose — in our view, something that is only understandable with reference to the uses

or goals that are objects of the "purpose" — the Court consistently referred to protected purposes as "lawful" and not "unlawful." In addition to the lawful defensive uses of weapons discussed in subsection 5 of this Part of our opinion, the Court identified no lawful purposes other than hunting and training. Id. at 604, 128 S. Ct. at 2804, 171 L. Ed. 2d at 665.

The only unprotected purposes and uses the Court recognized were those in furtherance of crimes and the "indiscreet firing of guns" in one city on specified dates around New Year's, which the Court concluded would not have been applied to punish one who fired in self-defense and that, even if it had been, the minimal sanctions for violation would not deter one from acting in necessary self-defense. Id. at 632-33, 128 S. Ct. at 2820, 171 L. Ed. 2d at 681-82.[22]

Most pertinent here, the Court also provided examples of limitations on the "manner" of carrying and using firearms in public places, originally understood to be part of the enshrined right. Immediately following its assertion about limitations on the manner and purposes of arming oneself that are part of the

_____

[22] While possession of a handgun without a carry permit where one is required is a second-degree crime, N.J.S.A. 2C:39-5b, as discussed in Part III, A, 2, a defense of self-defense is available where one arms oneself and fires to repel an imminent threat. Harmon, supra, 104 N.J. at 206-07.

original meaning, the Court stated: "[f]or example, the majority of the 19th century courts to consider the question held that prohibitions on carrying concealed weapons were lawful under the Second Amendment or state analogues." Id. at 626, 128 S. Ct. at 2816, 171 L. Ed. 2d at 678; see also Robertson v. Baldwin, 165 U.S. 275, 281-82, 17 S. Ct. 326, 329, 41 L. Ed. 715, 717 (1897) (observing in dicta that "the right of the people to keep and bear arms . . . is not infringed by laws prohibiting the carrying of concealed weapons").

As previously noted, in the first quarter of the 20th century, a New Jersey court joined the courts rejecting a Second Amendment challenge to a concealed weapons ban, which applied absent a carry permit issued on a showing of need. Angelo, supra, 3 N.J. Misc. at 1014-15 (quoted in Part III, B above); cf. Burton, supra, 53 N.J. at 100-06 (concluding the Amendment has no relevance to state laws — an interpretation now foreclosed by McDonald).

We take the Heller Court's recognition of the acceptance of prohibitions against concealed carrying as an indication that regulation of the manner of carrying bearable arms in public places — at least the concealed carrying — was understood to be part of the right. In Kachalsky, the Second Circuit reached that conclusion after an extensive review of laws in place

around 1791. 701 F.3d at 89-91, 94-96. One need not agree with that court's analysis of every law discussed to agree with its conclusion that "state regulation of the use of firearms in public was 'enshrined with[in] the scope' of the Second Amendment when it was adopted." Id. at 96 (quoting Heller, supra, 554 U.S. at 634, 128 S. Ct. at 2821, 171 L. Ed. 2d at 683); accord Drake, supra, 724 F.3d at 433 (concluding that the "'justifiable need' standard fits comfortably within the longstanding tradition of regulating the public carrying of weapons for self-defense"); Masciandaro, supra, 638 F.3d at 470 (observing that rights to firearms outside the home "have always been more limited," because of the implications for public safety).

The Kachalsky court's conclusion is also supported by Heller. The Supreme Court has made clear that there are permissible limitations other than those it expressly identified in Heller and McDonald as being within the Amendment's original meaning. In both opinions, the Court stressed that it should not be understood to "cast doubt on longstanding prohibitions on the possession of firearms by felons and the mentally ill, or laws forbidding the carrying of firearms in sensitive places such as schools and government buildings, or laws imposing conditions and qualifications on the commercial sale of arms."

<u>Heller</u>, <u>supra</u>, 554 <u>U.S.</u> at 626-27, 128 <u>S. Ct.</u> at 2816-17, 171 <u>L. Ed.</u> 2d at 678; <u>McDonald</u>, <u>supra</u>, ___ <u>U.S.</u> at ___, 130 <u>S. Ct.</u> at 3047, 177 <u>L. Ed.</u> 2d at 926.

Pertinent to the "justifiable need" component of the carry permit law, the Court's partial list approves absolute prohibitions of bearing firearms, without regard to the need to use defensive force, in certain public places that are "sensitive" — schools and government buildings.  General prohibitions of that sort are not based on characteristics of the person carrying them.  Thus, the Court's determination that bans on carrying in sensitive places are presumptively lawful had to be based on the Court's recognition that the Amendment was understood to allow the government to protect against dangers posed by any person possessing a firearm in these "sensitive" public places, despite the obvious and absolute impact on the use of a firearm defensively in those places. Because of the importance the Court placed on the Amendment's original meaning, we conclude the Court must have deemed such regulation in "sensitive" public places consistent with the original meaning.

True, laws like New York's, Maryland's and New Jersey's, which condition issuance of carry permits on a particularized showing of need have no precise models in laws in existence

49                                                    A-3704-11T4

around 1791 or in the <u>Heller</u> Court's list of presumptively lawful measures. <u>See</u> <u>Kachalsky</u>, <u>supra</u>, 701 <u>F.</u>3d at 90 n.11, 91. But the <u>Heller</u> Court stressed that it intended its list to illustrate, not exhaustively define, the class of laws entitled to a presumption of validity. <u>Heller</u>, <u>supra</u>, 554 <u>U.S.</u> at 627 n.26, 128 <u>S. Ct.</u> at 2817, 171 <u>L. Ed.</u> 2d at 678. As others have noted, the list is neither a "talismanic formula," <u>Kachalsky</u>, <u>supra</u>, 701 <u>F.</u>3d at 90 n.11, nor part of a "comprehensive code," <u>Skoien</u>, <u>supra</u>, 614 <u>F.</u>3d at 640.

Moreover, <u>Heller</u> makes it clear that the role of legislatures did not end with the Amendment's adoption in 1791. As others have noted, <u>Heller</u>'s partial listing of "presumptively lawful" measures includes modern-day laws consistent with the original meaning that do not parrot laws in place around 1791. <u>United States v. Booker</u>, 644 <u>F.</u>3d 12, 23-25 (1st Cir.) (noting that 20th century laws disqualifying felons, included in <u>Heller</u>'s list of presumptively lawful laws, likely bear little resemblance to their historical predicates), <u>cert. denied</u>, ___ <u>U.S.</u> ___, 132 <u>S. Ct.</u> 1538, 182 <u>L. Ed.</u> 2d 175 (2012); <u>see also</u> <u>id.</u> at 24 n.13 (noting that the "historical pedigree of laws disarming those convicted of a crime is subject to substantial debate among scholars"); <u>accord</u> <u>Skoien</u>, <u>supra</u>, 614 <u>F.</u>3d at 640-41. Moreover, the plurality opinion in <u>McDonald</u> stated,

"incorporation [of the Second Amendment through the Due Process Clause] does not imperil every law regulating firearms," ___ U.S. at ___, 130 S. Ct. at 3047, 177 L. Ed. 2d at 926, and it explained that incorporation "by no means eliminates" a state's "ability to devise solutions to social problems that suit local needs and values." ___ U.S. at ___, 130 S. Ct. at 3046, 177 L. Ed. 2d at 925.

Taking the statements, the holdings and the Court's reasoning on the enshrined limitations together, we conclude that, since the Amendment's adoption, legislators have been permitted to address current problems through regulations not inconsistent with or directed at suppressing or effectively extinguishing the right. The Court suggested as much when it stressed that its invalidation of the District of Columbia's law making it impossible to use a handgun for self-defense in the home should not be understood to suggest "the invalidity of laws regulating the storage of firearms to prevent accidents." Heller, supra, 554 U.S. at 632, 128 S. Ct. at 2820, 171 L. Ed. 2d at 681 (emphasis added). The Court had not discussed any historical predicates for laws designed to prevent accidental discharge of a firearm in the home or include such measures in its illustrative list of presumptively lawful measures. We take this as an indication that despite the absence of any direct

model in older laws, measures short of total bans designed to prevent accidental injuries with firearms are permissible, even in the home where the need for lawful defensive use is "most acute."

Finally, <u>Heller</u>'s closing passage must be understood to leave room for a continuing role for legislatures. There, the Court acknowledged the problem of "handgun violence" in this country and explained that the "enshrinement of constitutional rights" takes some policy choices for dealing with gun violence "off the table" — "includ[ing] the [option of an] absolute prohibition of handguns held and used for self-defense in the home." <u>Id.</u> at 636, 128 <u>S. Ct.</u> at 2822, 171 <u>L. Ed.</u> 2d at 684. Nevertheless, the Court stressed that "[t]he Constitution leaves . . . a variety of tools for combating" handgun violence "including some measures regulating handguns." <u>Ibid.</u> The Court left identification of the permissible tools for the future, without providing any specific guidance beyond a cross-reference to its partial listing of "presumptively lawful" measures. <u>Ibid.</u>

### 5. The Standard of Scrutiny

For the purpose of resolving this Second Amendment challenge before us, we are assuming that the Second Amendment protects the right of law-abiding and responsible citizens

(those protected by the Amendment under Heller), to carry a handgun (a firearm protected by the Amendment under Heller), in public places for lawful defensive use (the only protected purpose for carrying a handgun under Heller in public places where the obligation to show justifiable need pertains, N.J.S.A. 2C:39-5, -6). On those assumptions, we conclude that intermediate scrutiny is the proper measure of the validity of this component of New Jersey's carry permit law.

Heller strongly suggests that one of "the standards of scrutiny that [the Court has] applied to enumerated constitutional rights" should be employed in determining whether a law regulating firearms goes too far. 554 U.S. at 628, 128 S. Ct. at 2851, 171 L. Ed. 2d at 714. And the Court effectively narrowed the potentially applicable standards to strict and intermediate scrutiny by concluding that the rational basis test "could not be used to evaluate the extent to which a legislature may regulate a specific, enumerated right, be it freedom of speech, the guarantee against double jeopardy, the right to counsel, or the right to keep and bear arms." Id. at 628 n.27, 128 S. Ct. at 2817, 171 L. Ed. 2d at 679.

With respect to the bases for selecting between strict and intermediate scrutiny, the Heller Court avoided that constitutional question by noting the District of Columbia laws

at issue would not pass muster under either. 554 U.S. at 628-29, 128 S. Ct. at 2817-19, 171 L. Ed. 2d at 679-80. Consequently, from Heller, we know little more than that a law will not pass intermediate or strict scrutiny if it effectively bans an "entire class of 'arms' that is overwhelmingly chosen by American society for . . . lawful purposes" — handguns — and extends to the home, where the "need" for use of lawful defensive force is "most acute." Id. at 628, 128 S. Ct. at 2817, 171 L. Ed. 2d at 679. Those were the bases for the Heller Court's holding — that the District's law "banning from the home 'the most preferred firearms in the nation to keep and use for protection of one's home and family,' would fail constitutional muster." Id. at 628-29 n.27, 128 S. Ct. at 2817-18, 171 L. Ed. 2d at 679.

Each of the three federal courts of appeals that have scrutinized laws comparable to New Jersey's "justifiable need" standard have determined that an "intermediate" level of scrutiny is appropriate. In selecting intermediate scrutiny, all three courts considered Heller's reference to the "core" right of self-defense in the home. Drake, supra, 724 F.3d at 429-30; Woollard, supra, 712 F.3d at 876; Kachalsky, supra, 701 F.3d at 93. Because we are assuming a right that extends beyond

the home, we do not rely on anything special about the right in the home.

We deem an intermediate level of scrutiny appropriate for laws restricting only conduct in public places, because restrictions on the right imposed in the interest of safety and order in public places have always been understood to be part of the Amendment's scope.  Kachalsky, supra, 701 F.3d at 96-97 (determining that state regulation of firearms in public was enshrined with the Amendment and favored intermediate scrutiny); Woollard, supra, 712 F.3d at 876 (same, noting that "'outside the home, firearm rights have always been more limited, because public safety interests often outweigh individual interests in self-defense'" (quoting Masciandaro, supra, 638 F.3d at 470)). After all, the Heller Court identified absolute bans against possession of firearms in some "sensitive" public places as presumptively lawful and illustrated the limited nature of the right by noting the widespread acceptance of concealed carrying bans by 19th century courts.  554 U.S. at 626-27, 627 n.26, 128 S. Ct. at 2816-17, 171 L. Ed. 2d at 678.

As the Fourth Circuit explained in Masciandaro, 638 F.3d at 470-71: "One of the principal [19th century] cases relied upon in Heller upheld a state concealed carrying ban after applying

review of a decidedly less-than-strict nature.  See Nunn v. State, 1 Ga. 243, 249 (1846)."  In Nunn, the court concluded,

> a law which is merely intended to promote personal security, and to put down lawless aggression and violence, and to this end prohibits the wearing of certain weapons in such a manner as is calculated to exert an unhappy influence upon the moral feelings of the wearer, by making him less regardful of the personal security of others, does not come in collision with the Constitution.
>
> [1 Ga. at 249.[23]]

In our view, the extent of the burden a law imposes on exercise of the right is also relevant to the degree of scrutiny.  Kachalsky, supra, 701 F.3d at 93; Marzzarella, supra, 614 F.3d at 97.  In Moore, the Seventh Circuit invalidated an Illinois law that imposed "a flat ban on carrying ready to use guns outside the home."  702 F.3d at 937, 940-42.  As we understand the decision, it is primarily based on the extremity of the burden.  The majority noted that its decision rested not on "degrees of scrutiny" but on the state's failure to "justify

_____

[23] It is appropriate to consider here the reasoning of the 19th century courts addressing concealed carry laws.  The Heller Court looked to the reasoning in those decisions in concluding that the right was understood to be an individual right of self-defense.  The Court had no reason to consider those courts' understanding of the original balance of public and individual interests in public places, because the laws the Court was considering in Heller involved exercise of the right in the home.  554 U.S. at 610-14, 128 S. Ct. at 2807-10, 171 L. Ed. 2d at 669-71.

the most restrictive gun law of any of the 50 states," which went "too far." Ibid. The court invalidated the law because Illinois should have but failed to show more than a "rational basis" for concluding that its "uniquely sweeping ban was justified by an increase in public safety." Id. at 942.

In the course of its decision, the Moore court referred to New York's proper cause requirement, noting that, unlike the Illinois law, it recognized that "the interest in self-defense extends outside the home." Id. at 940. In staying its mandate to permit the legislature to draft a new law imposing "reasonable limitations, consistent with the public safety and the Second Amendment as interpreted in [its] opinion, on the carrying of guns in public," id. at 942, the court provided some guidance. Although the majority viewed the distinction between regulations applicable in the home and public places with some disapproval, id. at 941, it observed that other states "have decided that a proper balance between the interest in self-defense and the dangers created by carrying guns in public is to limit the right to carry a gun to responsible persons rather than to ban public carriage altogether . . . ." Id. at 940. Thus, while the court did not say so, its description of a law that would pass muster does not suggest that it be drafted with an eye toward passing strict scrutiny.

A-3704-11T4

We have not found any post-Heller decision in which a court concluded that a firearms law should be subjected to strict scrutiny.  Even courts considering a new law extending the presumptively lawful categorical bar that applies to felons, applicable wherever the person may be, to include persons convicted of misdemeanors involving physical domestic violence, have applied a level of scrutiny less stringent than strict.  The Seventh Circuit found no need to "get more deeply into the 'levels of scrutiny' quagmire," because "preventing armed mayhem, is an important governmental objective" and "logic and data establish[ed] a substantial relation between [the law] and this objective."  Skoien, supra, 614 F.3d at 642; accord Booker, supra, 644 F.3d at 25-28.

Intermediate scrutiny is appropriate here.  The "justifiable need" component of the carry permit law does not target protected conduct.  It is an effort to protect the public and accommodate those who have an objective reason to anticipate a need to use a gun in self-defense.  The law targets the dangers of misuse and accidental use of handguns that unquestionably have serious, injurious consequences wholly outside the purview of self-defense.  N.J.S.A. 2C:3-4, -5, -9.  While comparisons with other enumerated, limited rights are strained because each right is enshrined with

different understandings, it is important to recognize that the Second Amendment provides no more protection for unlawful uses of handguns than the First Amendment does for "fighting words." Heller, supra, 554 U.S. at 635, 128 S. Ct. at 2821-22, 171 L. Ed. 2d at 683-84; R.A.V. v. St. Paul, 505 U.S. 377, 386, 112 S. Ct. 2538, 2545, 120 L. Ed. 2d 305, 319-20 (1992).

A handgun, like other bearable "arms," is a tool long understood to be equally useful for offensive as well as defensive and unlawful as well as lawful purposes. See Heller, supra, 554 U.S. at 581, 128 S. Ct. at 2791, 171 L. Ed. 2d at 651 (quoting accepted definitions of "arms" around 1791). And where injury with a deadly weapon is inflicted with criminal recklessness or negligence, it is unlawful even if unintended. N.J.S.A. 2C:11-3, -4; N.J.S.A. 2C:3-9. Moreover, even if an accident does not rise to the level of recklessness or negligence, nothing in Heller suggests that accidental injury is within the scope of the Amendment's protection. Indeed, the Court stressed it was not suggesting that regulations concerning gun storage in the home to prevent accidents were outside the class of regulations the Amendment permits. Heller, supra, 505 U.S. at 632, 128 S. Ct. at 2819-20, 171 L. Ed. 2d at 681.

In applying intermediate scrutiny to New Jersey's "justifiable need" standard and the comparable laws of Maryland

and New York, the federal courts of appeals have variously characterized the states' interests — public safety and crime prevention — as important, substantial and even compelling. Woollard, supra, 712 F.3d at 882 ("significant"); Drake, supra, 724 F.3d at 437 ("significant, substantial and important"); Kachalsky, supra, 701 F.3d at 97 ("compelling"). And they have concluded that the "fit" between the adequate governmental interest and the law need not be perfect but only "reasonable" or "substantial." Woollard, supra, 712 F.3d at 878 ("reasonable"); Drake, supra, 724 F.3d at 436-37 ("reasonable"); Kachalsky, supra, 701 F.3d at 97-98 ("substantially related to").

In considering whether the fit between New Jersey's "justifiable need" requirement and the law's purpose is reasonable, the Third Circuit also considered whether New Jersey's law burdened more conduct than "reasonably necessary" to its substantial and important purpose. Drake, supra, 724 F.3d at 436-37. The courts considering New York's and Maryland's comparable laws did not expressly address that aspect of the fit. See generally Kachalsky, supra, 701 F.3d at 81; Woollard, supra, 712 F.3d at 865.

Notably, the federal courts of appeals addressing laws like New Jersey's have deemed it proper to defer to the state

legislatures' predictive determinations.  Drake, supra, 724 F.3d at 438 (noting that restrictions subject to intermediate scrutiny can be justified "'by reference to studies and anecdotes,'" and also by reference to "'history, consensus, and simple common sense'" (quoting IMS Health, Inc. v. Ayotte, 550 F.3d 42, 55 (1st Cir. 2008), abrogated on other grounds, 131 S. Ct. 2653, 180 L. Ed. 2d 544 (2011)); Kachalsky, supra, 701 F.3d at 99 (recognizing the existence of competing studies and data and observing, "it is the legislature's job, not ours, to weigh conflicting evidence and make policy judgments"); see also Woollard, supra, 712 F.3d at 877, 881 (discussing statistical evidence presented and concluding that it was the legislature's job to weigh it).

There is no question that New Jersey's "justifiable need" requirement burdens a law-abiding, responsible and adequately trained person's right to carry a handgun in the event a need to use it in lawful defense arises.  The standard we apply is fashioned to account for that admittedly significant burden on exercise of the right and for the fact that it is imposed only in public places, where restrictions on its exercise have always been understood to be part of the right.  On the foregoing understandings and the guidance from the decisions of other courts addressing similar laws, we will defer to the predictive

determinations made by our Legislature from 1882 until today. And we will consider whether the "justifiable need" component is supported by a substantial and permissible government interest; whether the "fit" between that governmental interest and "justifiable need" is substantial; and whether the law burdens no more conduct than is reasonably necessary.

For the reasons that follow, we conclude that the law easily passes muster under that standard.

### 6. "Justifiable Need" Passes Muster

Without question, the New Jersey Legislature's reasons for the carry permit law are legitimate. "There is no doubt that preventing danger to the community is a legitimate regulatory goal." Salerno, supra, 481 U.S. at 747, 107 S. Ct. at 2101, 95 L. Ed. 2d at 709. As the New Jersey Supreme Court has determined, the Legislature conditioned the issuance of a carry permit based on need on its longstanding "aware[ness] of the dangers inherent in the carrying of handguns and the urgent necessity for their regulation," a necessity attributable to the "serious dangers of misuse and accidental use." Siccardi, supra, 59 N.J. at 553, 558.

True, we do not have a record of the evidence concerning mishap and accidents with guns the Legislature considered prior to 1966 — when it prohibited youngsters from carrying firearms

in 1882; when it prohibited concealed carrying of handguns without a permit in 1905; and when it first conditioned issuance of carry permits on a showing of need in 1924.  It is reasonable to infer that the Legislature was acting on considerations and evidence similar to that considered by New York's Legislature when it adopted a carry permit law in 1911.  Kachalsky, supra, 701 F.3d at 97-98 (discussing the data).

As discussed in Part III, B of this decision, in 1966 our Legislature and in 1971 our Supreme Court had significant evidence relevant to the risks posed by the widespread carrying of handguns.  Thus, we know that the Legislature and the Court considered statistical and anecdotal evidence as well as the opinions of informed law enforcement officials and representatives of well-established and respected organizations promoting the legitimate and safe use of firearms.

The State at that time made a showing of the basis for the Legislature's predictive judgment that the "justifiable need" component of our carry permit law would minimize the risk of serious injury resulting from misuse and accidents with handguns in public places of this densely populated State.  This permissible government interest is substantial and significant. And there is a substantial fit between that interest in securing order and safety in public places and a law conditioning the

issuance of carry permits on a showing of "justifiable need" for carrying a handgun.

It is also clear that neither the goal nor the effort to achieve it by conditioning issuance of carry permits on need was questioned by the gun advocates who addressed the legislative committee in 1966.

The lack of controversy in 1966 is not surprising given the longstanding practice of regulating the carrying of firearms in this State and elsewhere. Apparently the commonsensical and logical consensus that "[a] gun is a potential danger to more people if carried" outside the home, Moore, supra, 702 F.3d at 937, has long been as obvious as it is now. See Drake, supra, 724 F.3d at 438 (noting the propriety of reliance on common sense, consensus and history).

Heller supports the conclusion that regulation of the carrying of handguns in public places, despite some impact on self-defense, has always been understood to be consistent with the scope of the limited right to bear arms. The reasoning of the 19th century state courts upholding laws regulating the carrying of certain weapons, which the Heller Court relied upon in discerning the individual nature of the right, was not consistent on all points. For example, in the extent to which the public interest could burden the individual right to arm

oneself for self-defense in public places.  See Kachalsky,

supra, 701 F.3d at 90-91.  Although those courts disagreed on

that point and others, including the relevance of militia

membership and the applicability of the Second Amendment to the

states, all but one recognized the permissibility of regulating

the exercise of the individual right to arm oneself in the event

of an occasion giving rise to a need to act defensively.  Bliss

v. Commonwealth, 12 Ky. 90, 92-93 (Ky. 1822) (concluding that

the right codified in that state's constitution, which expressly

prohibited laws restricting the right, could not be restrained

in any way to serve the public interest).

More important here, those courts described the

governmental interests that were understood to permit

restriction of the right in public places.  They described the

permissible restriction as those: "dictated by the safety of the

people and the advancement of public morals," State v. Reid, 1

Ala. 612, 616 (Ala. 1840); "passed to subserve the general good,

so as not to infringe the right secured, and the necessary

incidents to the exercise of such rights," Fife v. State, 31

Ark. 455, 460 (Ark. 1876); intended "to promote personal

security, and to put down lawless aggression and violence,"

Nunn, supra, 1 Ga. at 246; necessary "to counteract a vicious

state of society, growing out of the habit of carrying concealed

weapons, and to prevent bloodshed and assassinations committed upon unsuspecting persons," State v. Chandler, 5 La. Ann. 489, 489-90 (La. 1850); and "conducive to the public peace, and the protection and safety of the community from lawless violence," Andrews v. State, 50 Tenn. 165, 187-88 (Tenn. 1871). A court of this state reached the same conclusion in 1925. Angelo, supra, 3 N.J. Misc. at 1014-15 (recognizing that the Second Amendment right is a limited right and its exercise is subject to such conditions as the safety and welfare of the people require).

Thus, the New Jersey Legislature's longstanding recognition of the urgent necessity for regulating the carrying of handguns in public places is not new, unique or inconsistent with the right as interpreted in Heller. Such regulations, at least those falling short of extinguishing the right, were universally understood as consistent with the limited individual right during the period following the Second Amendment's adoption. Kachalsky, supra, 701 F.3d at 96 (discussing New York's "proper cause" standard and the well-established tradition of regulations in public places enshrined with the right); see Drake, supra, 724 F.3d at 432-34 (concluding, on similar reasoning, that the "justifiable need" standard fits so "comfortably" within the longstanding tradition as to qualify as presumptively lawful).

There is no basis for suspecting that the carry permit law is hostile to the Second Amendment right. The goal of the New Jersey Legislature's commitment to meeting the urgent necessity of addressing violence in public places is demonstrated by its efforts to address the problem on several fronts. One example is the establishment of the PTC to better educate and train local, county and State law enforcement officers. That effort was undertaken to minimize the need for widespread carrying of handguns in public to fend off unlawful aggressive conduct, which poses a risk that is enhanced in densely populated public places.

The carry permit law's training requirement is another example. Wherever the Legislature has authorized the carrying of handguns in public places — whether by employment-based exemption or carry permit — the Legislature has conditioned the license on adequate training and periodic re-qualification. N.J.S.A. 2C:39-6j, *l*; N.J.S.A. 2C:58-4d. Proficiency is a "sensibl[e]" condition imposed on exercise of the right to minimize the risk of misuse and accident inherent in carrying handguns in public places. As others have observed, apparently as a matter of logic and common sense, "[a] person who carries a gun in a public place but is not well trained in the use of firearms is a menace to himself and others." Moore, supra, 702

F.3d at 941.  That assessment entails a predictive determination that New Jersey's Legislature made long ago; and is not questioned in this case.

The State does not deny that the "justifiable need" requirement is designed to address the inherent danger of misuse and accidental use by keeping the number of handguns in public places down.  Before the Third Circuit, the State argued: "'The [standard] provides a means to determine whether the increase in risk and danger borne by the public is justified by a demonstrated risk and danger borne to the person seeking to carry a handgun.'"  Drake, supra, 724 F.3d at 437 (quoting Appellees' Brief 34).  But as the Second Circuit noted in Kachalsky, this is not an "arbitrary" basis for addressing the dangers to order and safety in public places comparable to limiting public possession to "every tenth citizen."  701 F.3d at 98.  Rather, it is an objective basis that is substantially related to the important interest in order and public safety and tailored to serve it by burdening as little conduct as is reasonably possible.  Ibid.

New Jersey's carry permit allows the carrying of handguns in public places where carry permits are required, despite the inherent danger, only where the person has adequate training to minimize the risk to the extent that is possible, and only where

there is a reason to conclude that doing otherwise would too heavily burden the individual right to use handguns lawfully — in those cases where the person has an objective reason to anticipate the need of using a handgun defensively that distinguishes the person from others.

As discussed in Part III of this opinion, the apparent need to use a firearm for a lawful purpose is the feature that unifies what otherwise appears to be a rather complex list of exceptions to the carry permit law found in N.J.S.A. 2C:39-6. The "justifiable need" requirement serves the same purpose as the employment-based exceptions, but does so on a case-by-case rather than a categorical basis. Thus, those who can show an objective reason — a reason other than a generalized concern about becoming a crime victim — to anticipate an attack necessitating the defensive use of a handgun can obtain a carry permit tailored to their showing of need.

To view this limitation based on an objective showing of need as inconsistent with the Amendment would be to seriously misunderstand Heller. Assuming no categorical disqualification of the firearm or the person carrying it, the Amendment protects the right to bear arms for self-defense. As the Heller Court implicitly recognized in noting the "need" for lawful use of

defensive force in the home, the right to use lawful defensive force has always been tied to need.

Lawful uses of defensive force are, and historically have been, inextricably intertwined with the existence of an objectively reasonable perception of the need to defend oneself against an immediate threat of serious harm from an unlawful use of force.  As our Court of Errors and Appeals explained long ago, "[t]he 'right of self-defense has always been regarded as founded on necessity . . . .'"  Brown v. State, 62 N.J.L. 666, 708 (E. & A. 1899) (quoting 1 Edward Hyde East, A Treatise of the Pleas of the Crown, 293 (1803)).  It is a right to protect oneself "'from such serious bodily harm as would give him a reasonable apprehension that his life was in immediate danger.'"  Ibid.  (quoting 3 Sir William Oldnall Russell, A Treatise on Crimes and Misdemeanors 208 (1809)).  As Kachalsky recognizes, there is no right of self-defense until the necessitating circumstance presents itself.  701 F.3d at 100; see also Harmon, supra, 104 N.J. at 208-09 (discussed in Part III, C).

In upholding laws conditioning issuance of carry permits on need, the Second, Third and Fourth Circuits have recognized: that the laws limit the ability to arm one's self for the purpose of self-defense; that there is presently conflicting data on the danger and benefits of widespread carrying of

handguns in public places; and that the laws burden but do not absolutely bar the conduct.  Drake, supra, 724 F.3d at 439; Woollard, supra, 712 F.3d at 880-81; Kachalsky, supra, 701 F.3d at 98-100.  Each of those courts found the state's interest sufficiently important and the fit between the need-based standard and the interest in order and safety in public places adequate to pass muster under the intermediate level of scrutiny they applied.  The Third Circuit went further and determined that the conditioning of carry permits on "justifiable need" did not burden more conduct than reasonably necessary to serve the State's purpose.

We see absolutely no basis for reaching a different conclusion here.  As interpreted in Heller, the Second Amendment protects lawful, not unlawful uses of firearms.  In the public places where a carry permit is required under the laws of this State, the only lawful use of a handgun is lawful self-defense. In our view, "justifiable need" accommodates that right in a manner that is wholly compatible with the right of self-defense.

The Amendment does not protect conduct resulting in unlawful injury just because the injury is inflicted with a protected weapon.  Where the result of an accidental use or misuse of defensive force is injury to someone who is not posing an immediate threat of unlawful use of injurious force, the

injurious conduct, if rising to the level of criminal recklessness or negligence, is an unlawful infliction of injury, whether or not the shooter intended to injure. N.J.S.A. 2C:11-4a(1), b(1); N.J.S.A. 2C:12-1a(2), b(3)-(4); N.J.S.A. 2C:3-4, -5, -9.

The risk of reckless and negligent injury is minimized but not eliminated with training, even with training like that required in New Jersey, which requires that the applicant demonstrate knowledge of the law as well as proficiency in the handling of a gun. N.J.A.C. 13:54-2.4; see generally Woollard, supra, 712 F.3d at 879-80 (discussing increased risks when the carrying of handguns in public places is widespread, identified by Maryland, which included escalation of force in confrontations and the confusion generated when multiple parties in a confrontation are armed). Unanticipated confrontations require split-second assessments under stressful circumstances. See Siccardi, supra, 59 N.J. at 551-52 (noting law enforcement officer's claim that an attack happens so quickly that in order to use a concealed weapon the victim does not have much time); see also Governor's Reconsideration and Recommendation Statement, Assembly No. 940, L. 1982, c. 154 (discussed in Part III, A, 2 above).

It is true that the "justifiable need" requirement does not accommodate the interest in use of a handgun defensively to fend off a random attack in a public place. But that is also true of random attacks that occur in "sensitive" public places where laws banning possession of firearms are, under <u>Heller</u>, presumptively lawful. While the "justifiable need" requirement has implications beyond schools and government buildings, one who has an objective reason to anticipate an unavoidable attack can obtain a carry permit.

The question comes down to whether New Jersey law, in excluding an accommodation for random attacks in public, has burdened the right of self-defense too much. Given the limited nature of this enumerated right, restricted as it has always been by reasonable regulations addressing the carrying of firearms in public places (adopted in the interest of public order and safety), we do not think the Amendment requires New Jersey to allow every law-abiding, responsible and trained person to carry a handgun in public absent "justifiable need."

The Legislature, long ago, made the predictive judgment that the widespread carrying of handguns in public places where a carry permit is required would not be consistent with public safety because of the inherent danger it poses. Other state legislatures have made the same determination. And we cannot

conceive of any action the Legislature could take to address that inherent danger in a manner more accommodating to the right to bear arms in public for lawful self-defense. The alternative to requiring a showing of "justifiable need" is widespread carrying of handguns, which would not address the problem at all. Siccardi, supra, 59 N.J. at 558.

In McDonald, the plurality indicated that states are not deprived of their ability, within the Amendment's limits, "to devise solutions to social problems that suit local needs and values." ___ U.S. at ___, 130 S. Ct. at 3046, 177 L. Ed. 2d at 925. We cannot conclude that the Amendment or the Court's recent decisions require this State to dismantle its statutory scheme addressing the risks of misuse and accidental use in public places devised long ago and developed over many years. This scheme is crafted to burden the exercise of the right to use handguns for lawful purposes as little as possible, without abandoning this effort to maintain order and safety in public places.

There is one final argument that must be addressed, which was not raised in Drake. These applicants argue that in excepting certain retired officers from making a showing of "justifiable need" to carry a handgun, the Legislature has

undermined the substantiality of its objective.  Admittedly, the argument has some facial appeal.

In Part III, A, 4 of this opinion, we discussed the distinctions between the pre-retirement duties and carrying privileges of retirees who are eligible and ineligible for these special permits.  Only those who served full-time and regularly in designated law enforcement agencies and had broad police powers and unlimited carrying privileges are eligible.  As previously discussed, AIU officers work for the fire department, and have limited carrying privileges, N.J.S.A. 2C:39-6a(8), and police powers, N.J.S.A. 40A:14-7.1d.

In Part III, A, 4, we also discuss that Congress, in adopting LEOSA, recognized that retired officers face dangers of retaliation that are different than those faced by others and that, by virtue of experience and training, they are better able than others to address them.  While the quality of Congress' predictive judgment is not readily apparent, we cannot conclude that the New Jersey Legislature was so far off the mark in relieving retirees from full-time and regular service as police officers of the obligation of showing "justifiable need" or that its determination undermines the substantiality of the governmental interest in otherwise limiting the right to carry firearms in public places to those private persons who

demonstrate "justifiable need."  The fact that the Legislature

has determined that retirees who served full-time in jobs that

warranted their possession of firearms at all times, whether or

not on duty, have a reason for needing a handgun that carries

over into retirement is not a reason to view the "justifiable

need" requirement with a different lens.  Presumably, it is a

matter the Legislature and Executive will continue to consider

as the scope of the Second Amendment right, as interpreted in

Heller and made applicable to the states in McDonald, is

clarified.

## V.  Equal Protection

We turn to consider the applicants' claim under the Equal

Protection Clause of the Fourteenth Amendment to the United

States Constitution.  It rests upon the applicants' objection to

distinctions the Legislature has drawn between retired law

enforcement officers who are and who are not eligible for

special permits to carry handguns under subsection l of N.J.S.A.

2C:39-6.

The Equal Protection Clause prohibits states from

"deny[ing] to any person within its jurisdiction the equal

protection of the laws."  U.S. Const. amend. XIV, § 1.

"[A]bsent an impact on a fundamental right or targeting of a

suspect class, a statute [withstands an equal protection

challenge] 'so long as it bears a rational relation to some legitimate end.'" Trautmann ex rel. Trautmann v. Christie, 211 N.J. 300, 304 (2012) (quoting Romer v. Evans, 517 U.S. 620, 631, 116 S. Ct. 1620, 1626, 134 L. Ed. 2d 855, 865 (1996)).

Statutory classifications that are not based on a suspect classification and statutes that do not implicate exercise of fundamental rights are deemed impermissible only when the law's objectives are not legitimate or the relationship between the permissible goal and classification is so attenuated as to be arbitrary or irrational. City of Cleburne v. Cleburne Living Ctr., 473 U.S. 432, 446-47, 105 S. Ct. 3249, 3258, 87 L. Ed. 2d 313, 324 (1985); Doe v. Poritz, 142 N.J. 1, 92 (1995).

These applicants do not contend that the distinctions drawn in subsection *l* are subject to scrutiny under a standard stricter than the rational basis test. Nor could they. Where a Second Amendment challenge fails and there is no suspect classification involved, as is the case here, a claim that others similarly situated are treated differently is reviewed only for rational basis. In Kwong v. Bloomberg, 723 F.3d 160, 170 n.19 (2d Cir. 2013), the court considered a Second Amendment challenge to a residential handgun licensing fee, subjected the fee to intermediate scrutiny under the Second Amendment, and concluded it passed muster. The court concluded that in that

circumstance the Equal Protection challenge to the fee required
no more than rational basis review because the Second Amendment
"analysis sufficiently" protected that right.  Id. at 170
(citing Nat'l Rifle Ass'n of Am. v. Bureau of Alcohol, Tobacco,
Firearms & Explosives, 700 F.3d 185, 211-12 (5th Cir. 2012);
Hightower v. City of Boston, 693 F.3d 61, 83 (1st Cir. 2012);
Nordyke v. King, 681 F.3d 1041, 1043 n.2 (9th Cir. 2012) (en
banc), cert. denied, ___ U.S. ___, 133 S. Ct. 840, 184 L. Ed. 2d
652 (2013)).

    As discussed in Part IV, B, 5, conditioning the issuance of
a carry permit on a showing of "justifiable need" survives
intermediate scrutiny under the Second Amendment.  Accordingly,
this objection, based on the fact that some retired officers are
not obligated to make that showing, is properly reviewed to
discern whether there is a rational basis for the distinction.
The basis for the distinction is discussed in Part III, A, 4.
Unlike the eligible retirees, these retirees had only limited
statutory carrying privileges and statutorily limited police
powers while employed.  Accordingly, their position is different
than that of the eligible officers.  See Governor's
Reconsideration and Recommendation Statement, Senate No. 1480,
L. 1985, c. 150 (discussed in Part III, A, 4 of this opinion).

Given the difference in the work experience, statutory police powers, and statutory carrying privileges which are the bases for issuance of these special permits available without a showing of "justifiable need," the Legislature could have reasonably concluded that retirees who served broader law enforcement roles while employed, as a group, face a greater risk of retaliatory violence following retirement than those whose statutory responsibilities were limited to investigating arson, suspicious fires and explosions.  The fact that these applicants may have exercised carrying privileges and dealt with crimes related to arsons under investigation or detected during the course of their work, does not make the classification arbitrary.

The applicants also contend that they each qualify for a special permit as a "qualified retired law enforcement officer, as [that term] is used in the federal Law Enforcement Officers Safety Act of 2004 [(LEOSA)], Pub. L. 108-277" and are treated differently than those retirees who are eligible on that basis, having served elsewhere and moved to New Jersey after retiring. See Casaleggio, supra, 420 N.J. Super. 121, 128-29 (so interpreting the statute).

The difficulty here is that neither applicant meets the definition of "qualified retired law enforcement officer, as

[that term] is used in the federal Law Enforcement Officers Safety Act of 2004 [(LEOSA)], Pub. L. 108-277." Ibid. LEOSA has been amended since 2004, and these applicants rely on LEOSA's current definition of the term "qualified retired law enforcement officer." That reliance is misplaced.

Based on our review of the history of this State's well-established record of closely guarding carry permits and subsection l's careful enumeration of eligible officers, we are certain that the Legislature would not intend courts to construe subsection l's reference to LEOSA to encompass any and all expansions of LEOSA's definition of qualified retired law enforcement officer that Congress might deem fit to adopt. See generally In the Matter of Commitment of Edward S., 118 N.J. 118, 133-36 (1990) (discussing interpretation of statutes incorporating a specific provision of law and concluding that the significance of the subsequent amendments to the incorporated law is a question of the Legislature's intent).

Congress has expanded the scope of LEOSA in ways that are inconsistent with N.J.S.A. 2C:39-6l. Compare 108 Pub. L. No. 277 (§ 926C(c)(1),(3)(A)) (defining qualified retired law enforcement officer to mean an individual who "before such retirement, was regularly employed as a law enforcement officer for an aggregate of [fifteen] years or more") with Pub. L. No.

111-272 (no longer limiting the definition to those "regularly employed as law enforcement officers" and reducing the necessary years of aggregate service from fifteen years or more to "[ten] years or more"); and with N.J.S.A. 2C:39-6*l* (limiting these special carry permits to retired officers who "regularly" served as a law enforcement officer before retiring from a designated law enforcement agency).

Under LEOSA as initially adopted, fifteen years of service as a law enforcement officer was required. Pub. L. No. 108-277, § 926C(c)(3). Daudelin had fifteen years of service in the AIU. Wheeler did not. But Daudelin did not have the photographic identification card required to meet LEOSA's definition. He had photographic identification cards depicting him as a retired "police captain" and an "arson captain" issued by the Newark Police Department, but pursuant to N.J.S.A. 40A:14-7.1a, AIUs are established within a City's fire department.[24] Thus, he did not have an identification card "issued by the agency from which

---

[24] As a practical matter, it is unclear how a permit can be issued based upon LEOSA qualification. That is so because a retired officer's status under LEOSA depends, in part, upon whether the retired officer is or is not intoxicated while in possession of the firearm — a determination that cannot be made when a permit is issued. See 18 U.S.C.S. § 923C(c)(6); cf. N.J.S.A. 2C:58-3c(2) (precluding issuance of a permit to purchase to a person who is a habitual drunkard); N.J.S.A. 2C:58-4d (requiring a person seeking a permit to demonstrate he or she is not disqualified pursuant to N.J.S.A. 2C:58-3c).

[he] retired from service." Pub. L. No. 108-277, § 926C(d)(1-2). In short, neither is qualified under the LEOSA definition incorporated by reference with careful precision in N.J.S.A. 2C:39-6*l*.

To avoid any confusion, it is worth noting that these applicants acknowledge that Congress, by adopting LEOSA, did not and could not constitutionally require a state to issue documents in furtherance of this federal firearms program. See Johnson v. N. Y. State Dep't of Corr. Servs., 709 F. Supp. 2d 178, 187 (N.D.N.Y. 2010) (relying upon Printz v. United States, 521 U.S. 898, 117 S. Ct. 2365, 138 L. Ed. 2d 914 (1997), which holds that Congress may not constitutionally compel state officers to take action to implement a federal program, and concluding that Congress could not compel states to issue documents to implement LEOSA).[25]

---

[25] Following oral argument on this appeal, the State moved to correct the record and the applicants opposed the motion. We reserved decision for disposition in this decision. The motion is more aptly characterized as one to supplement the record. The new information concerns the identification card issued to Daudelin. Our determination based on Daudelin's identification card is not based on that new information. It is based on the card submitted to the trial court, included in the appendix on appeal, and the statute authorizing the City of Newark and others to establish AIUs in their Fire Departments, not their Police Departments. Accordingly, the motion is denied.

## VI.  Privileges and Immunities

The applicants also contend that subsection *l* of N.J.S.A. 2C:39-6 violates the Privileges and Immunities Clause of Article IV, Section 2, Clause 1 of the United States Constitution. Their claim is premised on the fact that subsection *l* makes special permits to carry available to retired officers domiciled in New Jersey qualified under LEOSA, but not to retired officers domiciled elsewhere.  This issue was not raised in the trial court.

The Clause applies only to those "privileges" and "immunities" bearing upon the vitality of the Nation as a single entity with respect to which "the State [must] treat all citizens, resident and nonresident, equally."  Baldwin v. Fish & Game Comm'n, 436 U.S. 371, 383-84, 98 S. Ct. 1852, 1860, 56 L. Ed. 2d 354, 365 (1978).  Appellants argue that a retired law enforcement officer's receipt of a permit to carry a handgun in New Jersey "would certainly facilitate obtaining employment as an armed security officer in New Jersey."

There is no question that "pursuit of a common calling is one of the most fundamental of those privileges protected by the Clause."  United Bldg. & Constr. Trades Council v. Mayor & Council of Camden, 465 U.S. 208, 219, 104 S. Ct. 1020, 1028, 79 L. Ed. 2d 249, 259 (1984) (citing Baldwin, supra, 436 U.S. at

387, 98 <u>S. Ct.</u> at 1862, 56 <u>L. Ed.</u> 2d at 367-68).  It is also axiomatic that "[e]very inquiry under the Privileges and Immunities Clause 'must . . . be conducted with due regard for the principle that the States should have considerable leeway in analyzing local evils and in prescribing appropriate cures.'" <u>United Bldg. & Constr. Trades Council</u>, <u>supra</u>, 465 <u>U.S.</u> at 222-23, 104 <u>S. Ct.</u> at 1030, 79 <u>L. Ed.</u> 2d at 262 (quoting <u>Toomer v. Witsell</u>, 334 <u>U.S.</u> 385, 396, 68 <u>S. Ct.</u> 1156, 1162, 92 <u>L. Ed.</u> 2d 1467, 1471 (1948)).  Determinations about issuance of permits to carry handguns in public places are certainly a matter involving the analysis of local ills and cures.

In this case, there is an additional reason.  The record is inadequate to permit evaluation of the State's justification for any differential treatment of retired officers domiciled in and outside of New Jersey.  <u>See, e.g.</u>, <u>United Bldg. & Constr. Trades Council</u>, <u>supra</u>, 465 <u>U.S.</u> at 223, 104 <u>S. Ct.</u> at 1030, 79 <u>L. Ed.</u> 2d at 262 (remanding the case because the record was inadequate).  For that reason, deviation from our general

Because this claim was not raised in the trial court and because these officers are not in any event "qualified retired law enforcement officers" within the meaning of that term incorporated in <u>N.J.S.A.</u> 2C:39-6*l*, we would ordinarily decline to consider the point not raised in the trial court.

practice of declining to consider issues raised for the first time on appeal would be inappropriate. Nieder v. Royal Indem. Ins. Co., 62 N.J. 229, 234 (1973). Accordingly, we do not address the claim.

### VII. Preemption

The applicants raise an additional issue that requires only limited discussion. They contend that they cannot be prosecuted for violating N.J.S.A. 2C:39-5b because they are "qualified retired law enforcement officer[s]" within the meaning of LEOSA. As we understand their argument, the claim is that LEOSA precludes their prosecution pursuant to N.J.S.A. 2C:39-5b for possessing a firearm without a permit to carry. In this circumstance, where the claim is not dependent upon state law, incorporating LEOSA's definition as stated in a specific iteration of that statute, current federal law applies. There is dicta supporting the applicants' position in published opinions. See Johnson, supra, 709 F. Supp. 2d at 187 (indicating that LEOSA "only demonstrates an intent to bar the criminal prosecution of retired law enforcement officers who carry concealed firearms in interstate commerce"); Casaleggio, supra, 420 N.J. Super. at 128 (citing Johnson for that proposition and noting that LEOSA has a limited purpose).

A-3704-11T4

Nevertheless, the question of whether these applicants would be subject to prosecution for violation of N.J.S.A. 2C:39-5b if they were to carry handguns without having obtained permits in accordance with N.J.S.A. 2C:58-4 is not properly before us. The disappointed applicants did not file a complaint for a declaratory judgment in the trial court. That is the vehicle available for a person wishing to ascertain whether a proposed course of conduct violates the criminal law. See Keuper v. Wilson, 111 N.J. Super. 502, 506 (Ch. Div. 1970) (noting that "[t]he Uniform Declaratory Judgments Law has been increasingly used in this State to obtain a determination of the legality of a particular course of action rather than pursuing the course of action and risking criminal prosecution").

Because neither applicant has been charged with a crime and neither sought a declaratory judgment, their potential criminal liability is not before us.

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

A-3704-11T4